## CUNNINGHAM *v*. CHICAGO, M. & ST. P. R. Co.

*(Circuit Court, D. Minnesota.* July 16, 1883.)

1. PERSONAL INJURY—CONTRIBUTORY NEGLIGENCE.

    A., in the employ of a railroad company as yardman, while engaged in his occupation as such, attempted to board the switch-engine, with which he was working, by standing in the middle of the track and stepping on the rear foot-board of said engine, which was approaching him, tender first, at a rate of from one to three miles an hour, but, in the attempt, fell, was run over by the engine, and died from the effect of his injuries. The hand-rail on the rear end of the engine, which was approaching the deceased, had been torn off the previous night, and had not been replaced, and the rear foot-board of the engine in question was partly broken at one end. Suit was brought by the administratrix, the mother of the deceased, to recover the sum of $5,000. The jury returned a verdict for $1,000 in favor of the plaintiff. Before the jury left the jury-box a motion was made by the defendant to set aside the verdict. *Held*, that the act of so attempting to board the engine was clearly a case of gross contributory negligence on the part of the deceased, and the verdict should be set aside.

2. SAME—VOLUNTARILY ASSUMING A POSITION OF DANGER.

    If a man voluntarily and unnecessarily puts himself into a dangerous position, where there are other positions that he may take, in connection with the discharge of his duty, that are safe, he cannot recover damages for that injury to which he has contributed by his own negligence.

At Law.

This is an action brought by Mrs. Mary Cunningham to recover the sum of $5,000 damages for the death of Thomas McCarthy, the son of this plaintiff, which was caused by his being run over by a switch-engine, while he was in the employ of this defendant as such yardman. Defendant sets up contributory negligence as a defense.

The complaint alleges that the deceased was engaged in the employ of the defendant as yardman, in the city of St. Paul, and that it was necessary for him as such yardman to get on and off cars and engines while the same were in motion; that the engines in use for such yard business are what are called switch-engines, and are usually provided with foot-boards and hand-railings for the use and safety of the employes working around them; that on the first day of December, 1880, while the deceased was so employed, the said engine was so unskillfully, negligently, and improperly constructed and operated by defendant that the said John McCarthy was thrown from and run over by said engine, and received such injuries as resulted in his death on the tenth of December, 1880; that at the time of the accident the rear hand-railing on said engine was wholly broken off, and the rear foot-board on said engine was partly broken; of which defendant had due notice and which was unknown to this deceased. Answering this, the defendant admits the employment of the deceased, and that it was necessary for him as such yardman to ride upon said engine and cars; but denies that it was necessary for him, in the usual course of his employment, to get on or off said cars and engine while the same were in motion, and denies that said

engines are usually provided with hand-railings or foot-boards to enable the yardmen or brakemen to get on and off the said engine while in motion. Defendant admits that deceased, on or about December 1, 1880, while engaged as yardman, attempted to board said switch-engine, and in doing so slipped and fell, and received injuries from which he died on or about the tenth of December, 1880, but denies that deceased was in the proper performance of his duties, or that the engine was improperly or unskillfully constructed or handled. Defendant admits that at the time of the accident the rear hand-rail of said engine was wholly broken off and was absent; also that a small piece of the rear foot-board was and had been broken off for a long time prior to said accident; but alleges that the same was known to deceased, and that in all other respects said engine was in a good, safe, and proper condition. Defendant denies that said accident was owing to any carelessness, omission, negligence, or want of skill on the part of the defendant, and alleges that said accident occurred solely and entirely from the negligence and carelessness of the deceased.

Upon the trial of the case the following facts were uncontroverted: That on the first of December, 1880, the deceased was in the employ of the defendant in its switching yard in St. Paul, as yardman, where his duties were to couple and uncouple and switch cars, and ride to and fro upon the cars and engines as the necessity of the case demanded, being one of a crew of three who worked in the yard with one of the switch-engines of said defendant company; that he came down about 7 o'clock in the morning from the upper to the lower yard in the cab of the engine in question on the main line; that he then coupled the engine to a car on a side track, and on that car being switched onto another side track, rode down on said car, set the brakes on it, and then came onto the track on which the engine was backing towards him, stood in the middle of the track and attempted to board the engine, and in so doing fell between the rails, was run over by the engine, and received injuries of which he died. As to the manner in which he fell there is a dispute in the evidence to which we will refer hereafter. The evidence is that the engine was proceeding at a rate of from one to three miles an hour, but there is no proof that it was carelessly or unskillfully handled by those in charge of it. It is in proof that the switch-engines in use in this yard are fitted with foot-boards at each end, (there being no pilot) about 6 feet long, extending 6 or 8 inches beyond the wheels of the engine, and 8 or 10 inches wide, and reaching about 10 inches from the level of the ground; and said engines are also provided with a hand-rail in front and rear, running the width of the engine or tank,—the hand-rail on the rear part of the engine being, when in position, about 6 inches above the bed of the tank; and that there is the usual iron step and vertical hand-railing on each side of the engine, leading to the cab.

It is conceded that there was no hand-rail on the rear end of the

engine in question, it having been pulled off the night before by the night crew that worked on said engine. It is also conceded that there was a piece broken from one end of the foot-board about 2 inches wide and 18 inches long, running out to a point; but it is in proof that this defect in the foot-board had nothing whatever to do with, and in no way contributed to, the accident to the deceased, for the reason that where he stepped, or attempted to step, the foot-board was unbroken. The engineer of the engine in question stated that he had notified the master mechanic that the rear hand-railing was broken off some four or five days previous to the accident, and also that the foot-board was broken, by message and by letter to that effect. He also stated that the deceased was a skillful and experienced railroad man, and had been three or four months in the yard; that he had not ridden on this particular engine before, but had worked with another engine of the same kind, that was fitted with hand-rails and foot-boards of a like description, in the same yard; and that witness did not notify the deceased that the rail was broken off or the foot-board defective.

The main dispute as to the facts in the case arises between the testimony of the only two men who saw the accident, with regard to how the same happened. Both were on the foot-board, one at each end, when the deceased attempted to get on at the middle. The witness for the plaintiff states that he saw the deceased get on the foot-board with both feet and then reach up to catch hold of the railing, and finding it gone, lost his balance and fell off, and was run over by the rear trucks of the tank. He says:

"We made a switch and threw a car on the side track, and he rode the car in. The engine backed up, and I got on the hind end, and he walked across the track and stood in the center, and when the engine came up he got on to ride, and with both feet, and after he got on he reached to the top of the tank to catch hand-hold, and missed it and fell back. I think the engine was going about a mile and a half or two miles an hour."

On the other hand, the witness for the defendant, who was on the other side of the foot-board, says: "The first thing I noticed him he was going under the foot-board. I noticed he was standing on the track until we got right close to him. I wasn't exactly looking at him, but I noticed him going under. * * * It seems to me he didn't get up onto the foot-board square at all. I don't think he reached his hand up to get hold of any part of the tank. I know if he had got over the foot-board he must have struck the tank in some place; the motion of the engine would have brought him up against the tank. There was no difficulty in seeing there was no hand-rail; any one that looked at the engine at all could see there was no hand-rail." On cross-examination this witness said: "I wasn't exactly looking at him. I can't tell exactly what he did do. I know he didn't come against the tank, because I was right up near the tank; and I know he didn't come that far, because if he came up against

the tank,—I wasn't standing more than a foot and a half or two feet from him,—and I surely should have heard the noise on the tank, or something. I didn't see him slip. About the time I saw him he was going under. I should judge the engine was going about as fast as a person would walk,—about three miles an hour." Both these witnesses state that it was customary to get on engines approaching them in that manner, and that they frequently did so themselves. Two division superintendents were called, who had been engaged in railroading 26 or 27 years, respectively, and they both testified that the practice of boarding an approaching engine in the manner described was extremely dangerous and hazardous, and should never be attempted; while one who was the superintendent of the division of the defendant's road in St. Paul, and had charge of the yards in question, testified that he had always warned the yard-master here to forbid the men boarding an engine in front, coming towards them, and that if he saw any more of it he would dismiss the offenders; but they continued to do it. He further stated there was no general regulation to that effect.

Plaintiff's witnesses, in rebuttal, testified that they had never heard of any such order with regard to boarding an engine from the front, and had never received any such orders or warnings.

*W. W. Erwin,* for plaintiff.

*Bigelow, Flandrau & Squires,* for defendant.

MILLER, Justice, (*charging jury.*) The case before you presents two questions of fact to consider. The first is, whether the railroad company exercised due care and diligence in regard to the character of this engine on which the accident occurred. The main question in that respect, I think, turns upon whether there was negligence—carelessness—in starting that engine out, (it having been originally not a very good one,) with the want of this rail that was torn off the night before. It is the duty of these railroad companies, both with regard to passengers and to their own employes, to take due care, to exercise due diligence, to prevent injuries, and injuries of this character; and it is their business to see to it that the usual appliances for safety and security of life shall be furnished in the places and at the times that these persons, whether passengers or servants, have to be employed in their service. I don't know that you will find much difficulty on that branch of the subject. The other branch of the subject is that if you find that the company was negligent in regard to the character of this engine,—that it might have exercised and ought to have exercised more care in the kind of engine that was used,—then you will come to the question, did the plaintiff exercise proper care and diligence? For, although the negligence of the railroad company may be a cause, and probably a principal cause, of this man's loss of life, yet if he was careless himself, if his want of attention to his own safety contributed in any sensible degree to his death, the railroad company is not responsible. And that, as you will see at once,

arises from a philosophical examination of the necessities of the case. These railroad companies furnish a great amount of operative force, all of which is more or less dangerous, and most of which can be subjected and used in a manner which is dangerous to the personal safety and life of the individual, and their operations require that they shall use powerful instrumentalities. You cannot move these cars, you cannot move this immense machinery; you cannot use steam any more than you can use powder, without there being elements of danger in it; you cannot carry these great loads of freight, or transport the produce of Minnesota to the Atlantic ocean, and on its way to Europe, without the use and exercise of a power which, in itself, is naturally dangerous. These railroads do a great deal of good. The good that they do is largely in excess of the ill they bring. They have become a necessity of human life, and modern commerce, and business, and they must employ these dangerous and powerful agencies. The law requires of them to be very careful how they employ these dangerous agencies; it requires them to exercise constant vigilance and care that all their instrumentalities shall be of the proper and best quality; that in the use of them guards shall be taken for the security of limb and person by those who are engaged, who are transported, by them, whether as passengers or employes.

Now, that is the power employed by the railroad, and that is the duty of the railroad; but, for the very reason that the instrumentalities employed by these railroads must be powerful, must exercise very great force, must bring into play numerous elements that are dangerous to human life, it is necessary that those who deal with them should themselves exercise proper caution. A man has no right, because a fire is built in his neighborhood, to put his finger or his clothes into it and burn them, and then say, "I may sue and recover damages." A man has no right to thrust himself forward into a dangerous position and say, "If I am killed somebody will get damages for it;" or, "If I am hurt, I shall go to the hospital and be taken care of and recover damages." He has got to take care of himself, as well as the railroad has to take care of their duties and their employes. These obligations are mutual, and it is the law, and it is your duty to require it, as the law, that if a man voluntarily puts himself into a dangerous position,—does so unnecessarily, when there are other positions in connection with the discharge of his duty which are safe, which he can be placed in,—he cannot recover of the railroad company for damages for that injury to which he has contributed by his own negligence. That is the law. It is your duty to regard it, and you have no right to say that because this railroad company is a great and powerful instrumentality it must pay for this man's life, whether he was negligent or careless, or not.

Now, whether he was negligent or careless is for you to say. And it does not depend upon the opinion of any of these witnesses altogether. Inasmuch as some of them have had large experience and have been

much used to these things, and can see what perhaps you cannot see, their opinion is worth something, but is not necessarily to control you. You are to use the common sense for which you were summoned here as jurors, for yourselves, and say if this man, getting right in front of that machine, which was progressing towards him,— with a capacity to ruin him, to destroy him, to run over him, to kill him,—whether he acted carefully in stepping up upon that eight-inch or a foot-wide board, when, if he fell or slipped or lost his grip, or if there was no grip to take, he went under and was killed, inevitably, whether he exercised prudence when he could have acomplished the same end by getting on at the side, or, in the slow progress the engine was making, by getting on in the rear with perfect safety and perfect immunity, from endangering his life, at all events, whatever else might have happened to him; and if you believe that he did, carelessly and without due regard for his own safety, get upon this engine in a dangerous position, where it was much more probable that he would have been injured than by taking a safer course,—if he did this of his own promptings, and not because anybody told him to do it, then he is not entitled to recover any verdict at your hands.

That is the law of this case, gentlemen. You may take it.

— ———

The jury brought in a verdict for the plaintiff for $1,000.

Before the jury were discharged defendant's counsel moved for a new trial on the ground that the verdict was contrary to the law and the evidence, and asked that the motion be then heard.

*The Court.* I will hear the other side.

*Mr. Erwin.* I would like to refer your honor to some authorities on the subject of contributory negligence.

*The Court.* You may read them to the next judge who tries the case. I set this verdict aside. It was as clear a case of contributory negligence as has ever come under my observation, and it is with great reluctance that I refused to instruct the jury to find for the defendant. It is not only a case of clear negligence on the part of the deceased, but a case of stupid negligence on his part.