## ROCK ISLAND COAL MINING CO. v. DAVIS.

No. 3759.   Opinion Filed September 22, 1914.

Rehearing Denied December 8, 1914.

(144 Pac. 600.)

1. **MASTER AND SERVANT—Injury to Mine Employee—Negligence—Duty of Employee.** It is the duty of a mineowner to exercise ordinary care to provide a reasonably safe place in which his employee may perform his work, and he must use diligence to keep this place in a reasonably safe condition, and the diligence must be commensurate with the character of the services required and with the dangers a prudent man would apprehend under the circumstances of each particular case, and he is liable for any injury resulting from a failure to exercise such care; and it is the duty of an employee to exercise that degree of care which is commensurate with the character of his occupation, and that a reasonably prudent person would use under like circumstances to protect himself from injury.

2. **SAME—Duty of Mineowner.** It is a positive duty which the owner of a mine owes his servants, after the mine is opened and timbered, to use reasonable care and diligence to see that the timbers are properly set, and to keep them in proper condition and repair, and for this purpose to provide a competent mining boss or foreman, to make timely inspections of the timbers, walls, and roofs of the mine.

3. **SAME—Duty of Master—Safe Place to Work—Delegation to Servant—Negligence.** It is an absolute duty, which the master owes his servant, to exercise reasonable care and diligence to provide the servant with a reasonably safe place in which to work, having regard to the kind of work and the conditions under which it must necessarily be performed; and when the master, instead of performing this duty, delegates it to a servant, then such servant stands in the place of the master, and his negligence is the negligence of the master.

4.    **NEGLIGENCE—What Constitutes—Question for Jury.** Negligence is the absence of care according to the circumstances of each case, and is always a question for the jury, when there is a reasonable doubt as to the facts, or as to the inference to be drawn from them; **i. e.,** where reasonable men may differ as to the existence thereof.

(Syllabus by Galbraith, C.)

*Error from District Court, Pittsburg County;*

*Preslie B. Cole, Judge.*

Action by T. O. Davis against the Rock Island Coal Mining Company, for personal injuries. Judgment for plaintiff, and defendant brings error. Affirmed, and rehearing denied.

*Wright & Boyd, C. O. Blake,* and *W. H. Moore,* for plaintiff in error.

*Arnote & Rogers,* for defendant in error.

Opinion by GALBRAITH, C. The plaintiff in error was engaged in operating a coal mine, known as "Hartshorne No. 7," located near Hartshorne, in Pittsburg county, Okla., and the defendant in error charges in his petition that on February 21, 1910, he was employed at said mine as a shot firer, and while so employed, and when passing through the south main entry of said mine, the timbers gave way and a large quantity of rock and shale from the roof thereof fell upon him, crushing his leg and back and breaking two of his ribs, and otherwise seriously injuring him, and that this accident was due entirely to the negligence and carelessness of the plaintiff in error. The answer was a general denial and the affirmative defenses of contributory negligence and assumption of risk. The accident occurred some 500 feet underground and between seven and eight o'clock in the evening. It was contended by the defendant that the plaintiff was not injured at the time and in the place claimed, and that the mine boss had removed the timber charged to have fallen, and had taken down slate and shale from the roof at that place the afternoon of the day the plaintiff claimed to have been injured, and that, if injured at all, the plaintiff carelessly ran into this rock pile. Upon the is-

sues thus raised, the cause was tried to the court and a jury. A verdict was returned in favor of the plaintiff, and, upon the overruling of the motion for new trial, the defendant perfected an appeal to this court.

Error is assigned in overruling the motion for new trial, and in entering judgment for the plaintiff, and in giving a number of instructions, and in the refusal to give other instructions requested by the defendant.

The duties of plaintiff as shot firer required that he should go down in the mine, prepare and fire the shots after the miners had quit work and had gone out of the mine. There was no witness to the accident aside from the plaintiff; he being the only person in the mine at the time it happened, except a shot firer in another part of the mine, and who did not witness the accident. The plaintiff being the only witness to the accident, and his testimony being uncontradicted, in so far as his conduct is concerned, the circumstances connected with the accident and just how it happened may be explained in the plaintiff's own language. After stating that he had been employed as a shot firer by the defendant for something over three years, he testified in part as follows:

"Q. What were you doing for them in February, 1910? A. I was employed as shot fireman. Q. What are the duties of a shot firer, and what does he do? A. The duty of a shot fireman is to go in the pit after the diggers come out and shoot the shots that they have prepared. Q. What do you have to do in shooting a shot? What is the purpose of shooting shots? A. You have to examine a man's shot, and if it is a good shot, and everything properly prepared, it is the shot fireman's duty to put his powder in and tamp it and light the fuse and then get away. Q. On the 21st of February, did you shoot shots for the defendant company on that day? A. Yes, sir. Q. How many shots did you fire or light? A. Well, I can't say positive. I fire some ten or eight to ten or fifteen shots. I don't remember exactly the amount of shots, because I never kept no account of the numbers of shots I shot during the night. I just guessed them from the amount of places I had shot. Q. In what part of the mine did you work? A. I worked on the main

west, on the west side of the mine.   Q. The main west and the openings onto the main west, does that include the west side of the mine?   A. Yes, sir; that includes the west side of the mine and the openings off of the main west. * * * Q. What is your judgment as to the depth of the shaft?   A. My judgment is it is in the neighborhood of 500 feet.   Q. Into the ground?   A. Yes, sir.   Q. Well, now, what passages or entries were there off of this main west in that part of the mine?   A. Well, there was the first and second south, the third and fourth south, and the fifth and sixth south, and then there was the first and second north, and then entries leading off of the first and second north, and there was four entries leading off of the third and fourth south. * * * Q. I will get you to state again what direction the air passed through the fourth south main entry.   A. It was going south there.   Q. That is, it was going away from the main west?   A. Yes, sir; it was going toward the heading of the fourth south, or face of the fourth south. Q. In what portion of the mine did you fire shots on the night of the 21st of February, 1910?   A. I fired—the first shots I fired—you mean that main west entry there was a few rooms turned off of that and a little block of coal in there; and I fired shots in there, and I went from there onto the third south, and there was one place on the third south I believe; I am not sure whether it had shots in there that night or not.   No, there was two places working there, and I am not sure whether they had shots.   Q. Where did you go from there?   A. Up through the heading of the third south and through the cross cut to the fourth south.   Q. Where did you fire shots on the fourth south?   A. The first shot I light on the fourth south, my recollection is, was in what was known as the third west entry or room.   It was first turned as a room and driven up there west and was changed from a room to an entry.   Q. And was called what?   A. It was called the third west off the fourth south, and it had originally been room 25 or 26.   Q. Did you fire a shot in there?   A. I light one shot in there.   Q. Where was the next room this side of that place at that time?   A. My recollection is the next room that was working was twenty of the second west.   Q. That was room twenty of the second west?   A. Yes, sir.   Q. Now, did you say that you lighted a shot in that entry, the third west off of the main fourth south?   A. Yes, sir.   Q. What did you do then after you lighted that fuse?   A. When I light the fuse I started to run out of the third west onto the fourth south and turned down the fourth south to go to the second west, and I had just went a short distance

Rock Island Coal Mining Co. v. Davis.

down the fourth south when this rock fell on me. Q. Now, how high was the roof on the fourth south at that point, along about 25? A. Well, it was somewhere between four and five feet. Q. What is your height? A. five feet six and one-half inches. Q. Could you stand straight on the fourth south main entry there? A. No, sir; not at that place. Q. Well, then, when you ran out of this third west entry, in what position did you have to run? A. Why, I had to run stooped over. Q. Just describe what occurred to you there and the condition there. A. Well, as I went down the entry, I was going in as good a gait as I could go; run stooped over. Of course, in running away from a shot, I stoop over probably more than is necessary because I didn't know but what I might get a little too high and run my head against something, and I stoop until I know I will be clear of the roof at all low places, and I run in that position until I get to a safe place to stop, and as I went down the entry a rock fell on me and mashed me down on the bottom. Q. What point of your body did that rock strike you? A. It struck me on the back from my shoulders plumb back past my hip was where the rock was on me. Q. Mashed you down you say? A. Yes, sir. Q. What occurred then? What did you do? A. Well, I don't know that I realized anything for a moment or two. The first thing I do remember realizing, I heard rocks still popping over me, and I thought if I didn't get out right now I was gone, because I thought more rock would fall. Mr. Moore: Don't tell what your thoughts were. A. I made an effort to get out, and succeeded in getting out from under the rock, and I was on the rock, and I crawled off down the entry a ways and commenced trying to light a light that I carried in my hand, and I succeeded in getting a light, and I could still hear the rock popping, and I crawled a ways farther and stopped and laid down, and I laid there quite a bit, and I crawled on down the entry until I come to some water, and I was getting sick, so sick I felt like I couldn't go any farther, but I come to some water in the roadway, a low place where the water had gathered in the roadway, and I bathed my face in this water, and I laid down there a few minutes, and I got to feeling a little better, and I got up from there and held to the rib, and I stood up and went a ways, and I got sick and laid down again, and I would take it trying to crawl a little while and trying to walk a while or hop along until I got to the bottom and belled the engineer and he hoisted me out. * *. * Q. Had you fired any shots in any of those rooms there prior to this injury in February? A. No, sir. Q. Had you been in

any of them? A. No, sir; I hadn't been in any of them. Q. Now, how did you travel with reference to the rate of your speed from rooms 25 and 26 or the third west entry off of the fourth south entry back towards the main west? A. I traveled just as fast as I could run, in a stooped position. Q. What had been your habit with reference to going through this entry prior to this occasion on the 21st day of February? A. I went through there in a run all the time since these entries was started here. Q. Which entries do you mean? A. Third and fourth west, after they was started. I had to light these shots and make it down this first and second west to get a safe place to stop while these shots went off, and I went just as fast as I could run in order to get into the second west before these shots in these other places went off, so I would have a place to stop while the shots was going off. Q. Was it necessary to go fast? A. It was necessary to go fast in order to get there before any of the shots would go off. Q. Why was it necessary to get away from that shot? A. In order if I should have a windy shot and throwed fire that I wouldn't get burned by the shots that I had just light. Q. Well, now, on this evening of the 21st of February, 1910, after you had light the fuse on this third west entry off of the fourth south, how did you leave that third west entry and pass down the fourth south main entry? A. I left in a run and continued in a run until the rock caught me. Q. Did you know anything about the condition of this roof there where the rock fell? A. No, sir; I did not. Q. Didn't know anything about the condition of it at all? A. No, sir. Q. You knew nothing about it being dangerous? A. No, sir. Q. Or the timbers being rotten, anything of that kind? A. No, sir."

Cross-examination by Mr. Moore:

"Q. Mr. Davis, on this night this fall that you have described occurred on the fourth south main entry? A. Yes, sir. Q. I get that name right, do I, fourth south main entry? A. I always called it the main fourth south entry. Q. Which direction does that entry run? A. It runs south. Q. North and south? A. Yes, sir. Q. On this night you were approaching this point, where you describe this fall of rock, you was coming from the south? A. Yes, sir. Q. Were you running north? A. Yes, sir. Q. Except for the lights that you carry, that mine was entirely dark? A. Yes, sir. Q. Not a bit of light can get in there underground? A. No, sir. Q. It was utter blackness without your light? * * * Q. How many lights did you have that night? A. Had a light on my cap, and had it

on my head, and had another lamp in my hand. I don't know for sure whether I had it lighted or not. I kept it lighted when I was lighting my fuse; kept both lights then; and sometimes I would blow out this one that I carried in my hand, on account of when I would run against the wind the blaze would fly back. It was a big torch, and the blaze would fly back and burn my hand, and I would blow it out at times to keep from burning my hand when I ran out. Q. Did you have a safety lamp with you. A. Yes, sir. Q. Where did you carry that? A. I had on a belt, and I carried it hung in my belt. Q. As you came down the entry you had one light on your head? Which hand did you have the torch in? A. I think I had it in my right hand; that is where I kept it when I was lighting my fuse, and I usually carried it all the time in my right hand. Q. Your safety lamp hanging in your belt? A. Yes, sir. Let me correct that. I ain't sure, but I don't believe I had my safety lamp with me, because there was no gas in the third and fourth south, and sometimes—I didn't all the time—but sometimes I would take my safety lamp off when I went through the main west door, and I would sit it down at the main west door, and I would get it off then as I returned and would then hook it in my belt and carry it on the rest of the run. Q. Then, as you ran down there, what was the first intimation you had of anything wrong? A. When the rock hit me. Q. Then you say for a few minutes or a few seconds or some length of time you were not conscious? A. I have got the impression that I didn't remember anything for a few minutes. Q. Now, how many rock fell on you there, one rock or a quantity of rock? A. Well, it was a quantity of rock; it wasn't one rock. Q. What quantity would you say it was? A. I can't tell you how much, because I never went back to examine; the only thing I can judge from is from the weight of it. Q. When you came to, as you have told us, what was your position? How were you lying? What was your condition? A. I can't state positive, but I have always had the impression—I don't know how I got the impression, but I have always had the impression that I had this leg kind of doubled and mashed out that way and was laying with this right leg straight back. Q. Wasn't any rocks fell on your leg? A. There was rocks from my hips up to my head, and probably a little part of my hips down here on my things. Q. But on your legs there were no rocks? A. No, sir; I don't think there was. Q. Was you entirely covered with rocks? Was your head covered? A. No, sir; my head wasn't covered. Q. When you came to, the rock was from your shoulders down

to your hips, a little past your hips? A. Yes, sir; and one rock hit me on the head, just raised a little hair. Q. What did you do when you came to? A. I tried to get out, and succeeded."

The witness H. F. Erlich, quoting from plaintiff in error's brief, testified relative to the condition of the roof of the entry, and the probable cause of the rock falling, as follows:

"I was in the mine four or five days after the accident. I noticed the roof along about room 23 of the fourth south main entry just prior to the time that the plaintiff was injured. There was a bad rock all along between 23 and 26; there was timbers broken and rocks hanging loose over the timbers; and some places wasn't any timbers at all, and loose rock that ought to have been taken down. I was in the mine three or four days prior to the time of the injury to the plaintiff. When I returned to the mine, I noticed where rock had been taken out of the fourth main south near room 23. I had seen loose rock above the timber at that point. Wherever the mule passed under it, the collar of the mule rubbed the collar of the timber and scarred it. I had noticed that probably a month before Mr. Davis' injury. It might have been a week or two before Mr. Davis' injury that I noticed it last. I notified the company about the condition of the entry in the fourth south—bad rock all over it. I notified Mr. Thomas, the mine foreman. I notified him just once about three or four weeks before the accident."

Complaint is first made of the refusal of the court to give defendant's requested instruction No. 3, which reads as follows:

"The court instructs the jury that, under the laws of this state, the defendant in this case, at the time of the accident, was required to employ a fire boss, whose duty it was, under the evidence herein, to inspect the roof for defective timbers, or other dangerous conditions, and that, while defendant would be liable for the negligence of such fire boss, it would not be liable for any error in judgment made by him. You are therefore instructed that if you believe from the evidence that the defendant, at the time of the accident, had in its employ a fire boss, holding a certificate from the state authorities, that. on the morning said accident is alleged to have occurred, said fire boss inspected the point in the entry where the accident is said to have occurred, and that, as a result of said inspec-

tion, he was honestly of the opinion that said timber was sufficient to protect the miners passing under it, and there was no necessity at that time to take down the timbers, your verdict should be for the defendant, although you should find that said fire boss was mistaken in his judgment."

The refusal to give this instruction was not error, for the reason that the same did not correctly state the law. Section 3988, Rev. Laws 1910, reads as follows:

"The mine foreman shall give prompt attention to the removal of all dangers reported to him by the fire boss, or any other person working in the mine, and the said mine foreman, or his assistant shall visit and examine every working place therein at least once every day, while the miners of such places are, or should be at work, and shall direct that each and every working place be properly secured by props or timbers, and that no person shall be directed or permitted to work in an unsafe place, unless it might be for the purpose of making it safe."

Under this statute, the duty of daily inspection was imposed upon the mine foreman or his assistant, and he had no right to delegate this duty to the fire boss, or to any other person working in the mine, other than his assistant. This was a nondelegable duty, and a failure to discharge it constituted primary negligence on the part of the defendant. There is no evidence in the record to show that the mine foreman or his assistant performed the statutory duty to inspect "at least once every day" the entry of the mine where the accident complained of occurred.

Under the issues raised by the pleadings, and upon which this case was tried, the positive duties imposed by law upon the mine operator to the employee are important and controlling in the determination of the cause. What are these duties?

The Kentucky Court of Appeals in *Ashland Coal & Iron Co. v. Wallace,* 101 Ky. 626, 637, 42 S. W. 744, 746, in regard to these duties, said:

"It is the duty of the mine owner to exercise ordinary care to provide a reasonably safe place in which his employee may perform his work, and he must use diligence to keep this place in a reasonably safe condition, so that the servant may not be

exposed to unnecessary risk; and this diligence must be commensurate with the character of the service required and with the dangers that a reasonably prudent man would apprehend under circumstances of each particular case. A greater degree of care is required of the master who places his servant at work in a coal mine, beneath overhanging masses of rock which are liable to fall at any moment, than one who places his servant where such danger is not to be apprehended. A prudent man would exercise greater care and watchfulness in the former than in the latter case; and the greater the danger a prudent man would apprehend, the higher the degree of care and diligence are required of the master in the protection of the servant. For a failure to exercise this care, resulting in an injury to the servant, the master is liable, and this duty and liability extend, not only to the unreasonable and unnecessary risks that are known to the master, but also to such as a reasonably prudent man, in the exercise of ordinary diligence—diligence proportionate to the risk—would have known or discovered. *Cook v. Railway Co.,* 34 Minn. 45, 24 N. W. 311; *Noyes v. Smith,* 28 Vt. 59 [65 Am. Dec. 222]; *Gibson v. Railroad Co.,* 46 Mo. 163 [2 Am. Rep. 497]; *Jones v. L. & N. R. R. Co.,* 95 Ky. 576, 26 S. W. 590; *Flahiff v. L. & N. R. R. Co.,* 9 Ky. Law Rep. 398; *Lawrence v. Hagemeyer,* 93 Ky. 591 [20 S. W. 704]; *Union Pacific R. R. Co. v. Jarvi,* 53 Fed. 65 [3 C. C. A. 433].

" 'And whilst the employer cannot be held bound as an insurer of the safety of the place in which he puts his servant, he is in every case bound to exercise that care and diligence proportionate to the occupation which a reasonably prudent man would use under like circumstances, both to provide and keep in a reasonably safe condition the place of work; and this duty is personal to the master, and cannot be so delegated as to relieve him of liability.' *Railway Co. v. Herbert,* 116 U. S. 642, 648, 652 [6 Sup. Ct. 590, 29 L. Ed. 755].

"On the other hand, it is the duty of the servant to exercise that degree of care which is commensurate with the character of his occupation, which a reasonably prudent person would use under like circumstances, in order to protect himself from injury; and, if he fails to exercise this care, he cannot recover of the master for an injury to which his own negligence has contributed, even though the master has failed to exercise due care on his part. He cannot recklessly expose himself to a known danger and to a danger which an ordinarily prudent and intelligent man would, in his situation, have apprehended,

and then recover of the master for an injury which his own carelessness has caused. *Cunningham v. Railway Co.* [C. C.] 17 Fed. 882, 886; *De Lozier v. Ky. Lumber Co.*, 13 Ky. Law Rep. 818 [18 S. W. 451]; *L. & N. R. R. Co. v. Shivell*, 13 Ky. Law Rep. 902 [18 S. W. 944]; *Doyle v. Swift's Iron & Steel Works*, 5 Ky. Law Rep. 59; *Bunt v. Mining Co.*, 138 U. S. 483, 485 [11 Sup. Ct. 464, 34 L. Ed. 1031]; *Railroad Co. v. Jones*, 95 U. S. 439, 443 [24 L. Ed. 506]; *Kane v. Railway Co.*, 128 U. S. 91, 94 [9 Sup. Ct. 16, 32 L. Ed. 339].

"The degree of care required of the master and servant in particular cases is generally different, whilst each is required to exercise that degree of care in the performance of his duties which a reasonably prudent person would use under like circumstances. The primary duty on the part of the master of using care to furnish a reasonably safe place for the servant is more important than the duty of the servant to use reasonable care to protect himself, because the master is required to use a degree of care in the preparation and subsequent inspection of an entry to a mine that is not primarily demanded of a servant. The master must inspect the entries in which the servant is engaged in work, and the servant has the right to presume, when directed to work in a particular place, that the master has performed this duty and to proceed with his work, relying upon this presumption, unless a reasonably prudent and intelligent man, in the performance of his work as a servant in a mine, under like circumstances, would be able to discern risks which defects in a mine indicate. *Russell v. Railway Co.*, 32 Minn. 230 [20 N. W. 147]; *Gibson v. Railway Co.*, 46 Mo. 163 [2 Am. Rep. 497]."

In *Western Coal & Mining Co. v. Ingraham*, 70 Fed. 219, 17 C. C. A. 71, Judge Caldwell, rendering the decision of the Circuit Court of Appeals for the Eighth Circuit, in a case similar to the case at bar, said:

"The duty which one operating a coal mine owes to his employees is not a new question in this court. In the case of *Railway Co. v. Jarvi*, 10 U. S. App. 444, 3 C. C. A. 433, 53 Fed. 65, a miner was injured by the fall of a rock from the roof of the mine, and, in affirming the judgment he had recovered for the injuries he received, this court, in defining the duty of a mining company to its employees, said: 'It is the duty of the employer to exercise ordinary care to provide a reasonably safe place in which his employee may perform his service. It is his

duty to use diligence to keep this place in a reasonably safe con-
dition, so that his servant may not be exposed to unnecessary
and unreasonable risks. The care and diligence required of the
master is such as a reasonably prudent man would exercise un-
der like circumstaances in order to protect his servants from in-
jury. It must be commensurate with the character of the ser-
vice required, and with the dangers that a reasonably prudent
man would apprehend under the circumstances of each particu-
lar case. Obviously a far higher degree of care and diligence
is demanded of the master who places his servant at work dig-
ging coal beneath overhanging masses of rock and earth in a
mine than of him who places his employee on the surface of
the earth, where danger from superincumbent masses is not
to be apprehended. A reasonably prudent man would exercise
greater care and watchfulness in the former than in the latter
case, and, throughout all the varied occupations of mankind, the
greater the danger that a reasonably intelligent and prudent
man would apprehend, the higher is the degree of care and
diligence the law requires of the master in the protection of the
servant. For a failure to exercise this care, resulting in the in-
jury of the employee, the employer is liable, and this duty and lia-
bility extend, not only to the unreasonable and unnecessary risks
that are known to the employer, but to such as a reasonably
prudent man in the exercise of ordinary diligence—diligence
proportionate to the occasion—would have known and appre-
hended. *Cook v. Railroad Co.*, 34 Minn. 45, 24 N. W. 311;
*Hayden v. Manufacturing Co.*, 29 Conn. 548; *Noyes v. Smith*,
28 Vt. 59 [65 Am. Dec. 222]; *Gibson v. Railroad Co.*, 46 Mo.
163 [2 Am. Rep. 497]; *Nadau v. Lumber Co.*, 76 Wis. 120, 43
N. W. 1135 [20 Am. St. Rep. 29]; *Hutchinson v. Railroad Co.*,
5 Exch. 434; *Huddleston v. Machine Shop*, 106 Mass. 282; *Snow
v. Railroad Co.*, 8 Allen [Mass.] 441 [85 Am. Dec. 720]; *Sul-
livan v. Manufacturing Co.*, 113 Mass. 396; *Ryan v. Fowler*,
24 N. Y. 410, 82 Am. Dec. 315; *Patterson v. Railway Co.*,
76 Pa. 389 [18 Am. Rep. 412]; *Swoboda v. Ward*, 40 Mich.
420.'

"After stating that it is the duty of the servant to exercise
that degree of care which a reasonably prudent person would
employ under like circumstances in order to protect himself
from injury, the opinion proceeds: 'But the degrees of care in
the use of a place in which work is to be done, or in the use
of other instrumentalities for its performance, required of the
master and servant in a particular case, may be, and generally
are, widely different. Each is required to exercise that de-

gree of care in the performance of his duty which a reasonably prudent person would use under like circumstances; but the circumstances in which the master is placed are generally so widely different from those surrounding the servant, and the primary duty of using care to furnish a reasonably safe place for others is so much higher than the duty of the servant to use reasonable care to protect himself in a case where the primary duty of providing a safe place or safe machinery rests on the master, that a reasonably prudent person would ordinarily use a higher degree of care to keep the place of work reasonably safe, if placed in the position of the master who furnishes it than if placed in that of the servant who occupies it. Of the master is required a care and diligence in the preparation and subsequent inspection of such a place as a room in a mine that is not, in the first instance, demanded of the servant. The former must watch, inspect, and care for the slopes through which and in which the servants work as a person charged with the duty of keeping them reasonably safe would do. The latter has a right to presume, when directed to work in a particular place, that the master has performed his duty, and to proceed with his work in reliance upon this assumption, unless a reasonably prudent and intelligent man, in the performance of his work as a miner, would have learned facts from which he would have apprehended danger to himself. *Russell v. Railway Co.,* 32 Minn. 230, 20 N. W. 137; *Hutchinson v. Railroad Co.,* 5 Exch. 343; *Gibson v. Railroad Co.,* 46 Mo. 163 [2 Am. Rep. 497]; *Cook v. Railroad Co.,* 34 Minn. 47, 24 N. W. 311.'

"In the case of *Mather v. Rillston,* 156 U. S. 391, 15 Sup. Ct. 464 [39 L. Ed. 464], the Supreme Court of the United States, in defining the duties mineowners owed their employees, said: 'All occupations producing articles or works of necessity, utility, or convenience may undoubtedly be carried on, and competent persons, familiar with the business, and having sufficient skill therein, may properly be employed upon them, but in such cases, where the occupation is attended with danger to life, body, or limb, it is incumbent on the promoters thereof and the employers of others thereon to take all reasonable and needed precautions to secure safety to the persons engaged in their prosecution, and for any negligence in this respect, from which injury follows to the persons engaged, the promoters or the employers may be held responsible and mulcted to the extent of the injury inflicted. * * * Occupations, however important, which cannot be conducted without necessary danger to life, body, or limb, should not be prosecuted at all

without all reasonable precautions against such dangers afforded by science. The necessary danger attending them should operate as a prohibition to their pursuit without such safeguards. Indeed, we think it may be laid down as a legal principle that, in all occupations which are attended with great and unusual danger, there must be used all appliances readily attainable known to science for the prevention of accidents, and that the neglect to provide such readily attainable appliances will be regarded as proof of culpable negligence. If an occupation attended with danger can be prosecuted by proper precautions without fatal results, such precautions must be taken by the promoters of the pursuit or employers of laborers thereon. Liability for injuries following a disregard of such precautions will otherwise be incurred, and this fact should not be lost sight of.' "

Again, on page 223 of 70 Fed., on page 75 of 17 C. C. A., it is said:

"Whatever may be the duty of coal miners with reference to timbering the slopes and roofs of the rooms from which they remove the coal, the rule is well settled that, after a mine is once opened and timbered, it is the duty of the owner or oprator to use reasonable care and diligence to see that the timbers are properly set, and keep them in proper condition and repair. For this purpose it is his duty to provide a competent mining boss or foreman to make timely inspections of the timbers, walls, and roof of the mine, to the end that the miners may not be injured by defects or dangers which a competent mining boss or foreman would discover and remove. This is a positive duty which the master owes the servant. A neglect to perform this duty is negligence on the part of the master, and he cannot escape responsibility for such negligence by pleading that he devolved the duty on a fellow servant of the injured employee. It is an absolute duty which the master owes his servant to exercise reasonable care and diligence to provide the servant with a reasonably safe place in which to work, having regard to the kind of work and the conditions under which it must necessarily be performed; and whenever the master, instead of performing this duty in person, delegates it to an officer or servant, then such officer or servant stands in the place of the master, and the negligence of such officer or servant is the negligence of the master; and any servant injured by such negligence may recover from the master for such injury, re-

gardless of the relation the injured servant sustained to the officer or servant whose negligence resulted in inflicting the injury.

" 'A master,' says the Supreme Court in *Railroad Co. v. Baugh*, 149 U. S. 368, 13 Sup. Ct. 914 [37 L. Ed. 772], 'employing a servant, impliedly engages with him that the place in which he is to work and the tools or machinery with which he is to work or by which he is to be surrounded shall be reasonably safe. It is the master who is to provide the place and the tools and the machinery, and, when he employs one to enter into his service, he impliedly says to him that there is no other danger in the place, the tools, and the machinery than such as is obvious and necessary. Of course, some places of work and some kinds of machinery are more dangerous than others, but that is something which inheres in the thing itself, which is a matter of necessity, and cannot be obviated. But within such limits the master who provides the place, the tools, and the machinery owes a positive duty to his employee in respect thereto. That positive duty does not go to the extent of a guaranty of safety, but it does require that reasonable precautions be taken to secure safety, and it matters not to the employee by whom that safety is secured or the reasonable precautions therefor taken. He has a right to look to the master for the discharge of that duty, and if the master, instead of discharging it himself, sees fit to have it attended to by others, that does not change the measure of obligation to the employee, or the latter's right to insist that reasonable precaution shall be taken to insure safety in these respects. Therefore it will be seen that the question turns rather on the character of the act than on the relations of the employees to each other. If the act is one done in the discharge of some positive duty of the master to the servant, then negligence in the act is negligence of the master; but, if it be not one in the discharge of such positive duty, then there should be some personal wrong on the part of the employer before he is held liable therefor.'

"The plaintiff was set to work in a room already timbered, and, as was said by this court in *Railway Co. v. Jarvi, supra*, he had a 'right to presume, when directed to work in a particular place, that the master has performed his duty, and to proceed with the work in reliance upon this assumption, unless a reasonably prudent and intelligent man, in the performance of his work as a miner, would have learned facts from which he would have apprehended danger to himself.' "

The foregoing decisions, which are in line with the weight of authority, hold that one of the positive duties which the law imposes upon the master is to exercise care to provide a reasonably safe place for the servant to work, and that the degree of care demanded of him depends upon the natural dangers incident to the employment; that is, that a greater degree of care is required of the master who is a coal operator working the servant in the mine underground than of the master who requires his servant to work in a less hazardous occupation out in the open. All of these authorities agree that the failure of the master to discharge this positve duty constitutes primary negligence, and that he is liable for injury resulting therefrom.

It is argued that the court's refusal to give defendant's requested instruction No. 4 was error. It seems that the court gave this instruction in the language requested, except that it added the phrase "without negligence on the part of the defendant that caused such injury." This modification of the instruction was not prejudicial error, for the reason that, taken in connection with the other instructions given, it was a fair statement of the law arising upon the issue.

We have examined with care the assignments of error urged to the giving of instructions No. 2 and No. 4½ of the court's instruction to the jury. No. 2 is a statement by the court of the issues in the case, and it is complained of because the court did not specifically state that the defendant pleaded, with its other defenses, a general denial. The court attempted to state the defenses set out in the answer, and, if it did not state them specifically enough to satisfy the defendant, it should have requested the court to state them more specifically at the time. It did not do this. It is too late now to complain of this. It is clear that the jury understood that the defendant denied liability in this case.

Again, complaint is made of instruction No. 4½. This instruction reads as follows:

"You are further instructed that the term 'contributory negligence' is defined to be such negligence on the part of the

plaintiff as helped to produce the injury complained of, and, in order for such contributory negligence to be sufficient to prevent the plaintiff from recovering, it must have been the proximate cause of his injury."

This instruction, taken alone, might at first glance be considered an incorrect statement of the law, or at least an unduly abbreviated statement of it, but, when carefully analyzed and considered in connection with instruction No. 4, it is not justly subject to this criticism. Instruction No. 4 reads as follows:

"You are further instructed that a person working in a coal mine is bound to take notice that it is a dangerous occupation, and it is his duty to use ordinary care and prudence to observe the rules and customs of the mining company employing him, not in violation of law, to prevent an accident or injury. Where one is informed or has notice of danger which threatens injury to himself, or where one voluntarily places himself in a dangerous place, or where, by ordinary observation and care, he could avoid such danger by reasonable exertion, and he fails to do so, he is guilty of contributory negligence."

It will be observed that in No. 4½ the court defines contributory negligence as negligence on the part of the plaintiff "that helped to produce the injury complained of," and tells the jury that, before such negligence can prevent or bar a recovery by the plaintiff, "it must have been the proximate cause of the injury." That was equivalent to saying that, if the negligence of the plaintiff entered into and contributed to his injury to such an extent that it could be said to be the proximate cause thereof, he could not recover. The court, as it was its duty to do, submitted to the jury the question to determine as to whose negligence was the proximate cause of the injury complained of, as to whether it was that of the defendant mining company, its servants and employees, or whether it was the plaintiff's. By the verdict returned the jury found that the defendant's negligence was the proximate cause of the injury. There is abundant evidence in the record to support this finding, and it is therefore binding upon this court, unless it is found that the court misled the jury in instructions to such an extent that it understood its duty to be different in the case from

what it actually was. *Big Jack Mining Co. v. Parkinson,* 41 Okla. 125, 137 Pac. 678. We cannot say that the jury was mis-led in any way as to its duty in this cause by the above instruc-tion, or in any of the other instructions given by the court to the jury.

Upon the whole record, we are strongly impressed with the conviction that the judgment rendered upon the verdict of the jury was just; and we therefore conclude that the excep-tions should be overruled, and the judgment appealed from should be affirmed. It should be further ordered that the for-mer opinion filed in this case be withdrawn and this one substi-tuted therefor, and further that the petition for rehearing be denied.

By the Court: It is so ordered.