# Richmond

## Stonega Coke and Coal Company v. Williams.

### November 20, 1913.

### Absent, Keith, P.

1. Master and Servant—*Boss of Gang—Vice-Principal—Safe Place.*—Ordinarily the foreman or boss of a gang of hands employed in executing the master's orders is a mere fellow-servant with the other members of the gang, but if he is discharging a non-assignable duty of the master he is to that extent a vice-principal. One of these non-assignable duties is to exercise ordinary care to provide a reasonably safe place in which the servant is to work. If the place was originally safe, but has become unsafe during the absence of the servant, and he is ignorant of this fact, and cannot discover it by the exercise of ordinary care, it is the duty of the master to inform him of it, and, in his absence, this duty devolves upon the foreman of the gang, as vice-principal.

2. Master and Servant—*Unsafe Place—Knowledge of Vice-Principal—Demurrer to Evidence.*—Since the jury might have found that the vice-principal of the defendant had knowledge of the danger to which the plaintiff was subjected, and that the proximate cause of the plaintiff's injury was the negligent failure of the vice-principal to give him warning of such danger, this court, upon a demurrer to the evidence by the defendant, must so find.

3. Master and Servant—*Risks Assumed by Servant.*—An employee only assumes the risks ordinarily incident to the service, and those known to him or so obvious as to be readily observed by one of his age, experience and mental capacity in the exercise of ordinary care.

4. Demurrer to Evidence—*Negligence—Contributory Negligence.*—On a demurrer to the evidence by the defendant, if, as in the case at bar, the jury might have found that the proximate cause of the plaintiff's injury was the negligence of the defendant, and that the plaintiff was without fault on his part, the court must so find.

42

Error to a judgment of the Circuit Court of Wise county in an action of trespass on the case. Judgment for the plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Bullitt & Chalkley,* for the plaintiff in error.

*Vicars & Peery* and *C. R. McCorkle,* for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

This suit was brought to recover damages for the alleged injury of the plaintiff by the defendant company, a coal mining corporation. At the trial of the cause there was a demurrer to the evidence by the defendant company, which was overruled, and judgment given the plaintiff for the damages ascertained by the jury. This ruling of the trial court is brought under review by writ of error awarded by one of the judges of this court.

Viewing the evidence from the standpoint of the demurrer thereto, the following are the facts appearing in the record. The plaintiff, Ivory Williams, a youth of eighteen years, was, at the time of the injury of which he complains, in the employ of the defendant company as motorman at the mining operation of the company known as Roda Mine No. 2. Mine No. 2 is connected with Mine No. 1—that is to say, the entrance to both is the same; one branches off from the other about eight hundred feet from the drift-mouth of the entry. There is a track entering the mines known as the "load track" on which cars loaded with coal are pulled out of the mine with electric motors, and another track entering the mines called the "cut-around track."

The motor upon bringing a "trip" of loaded coal cars out of the mine, and after getting down near the tipple, cut loose from the "trip" of coal cars, run past the switch of the "cut-around" track, and then run back on the "cut-around" track and into the mine about five hundred feet. The switch referred to is a cross-over switch, crossing over the "load track" and joining with a track called the "empty chute." After the motor cuts loose from the cars, they run down to the tipple by gravity, and are there dumped, and then are pushed back on the empty track and run again by gravity back on to the "empty chute," this "empty chute" being lower towards the drift-mouth than it is at the tipple. The motors are then run into the "empty chute" from a point five hundred feet within the mine, as before mentioned, pick up the empties and carry them into the mine for distribution. There is also another track shown on a diagram made a part of the record in this cause outlining the situation of the company's various tracks at the drift, which is designated as the "timber track," and extends outside of the mine down the hill to the place where timber is loaded upon cars to be taken into the mine. Still another track running off in the opposite direction from the timber track leads to the motor house, where the motors are taken for repairs, and sometimes taken for storage purposes when they can be gotten there. The "load track," it appears, was frequently blocked, and the motors, when the operators ceased to use them for the day, would be left in the "cut-around" track, frequently within the drift-mouth to the distance of as many as one hundred and fifty feet, and sometimes out of the drift-mouth around the sand house, a short distance from the drift-mouth. The defendant company, in the operation of its mine, had a day and night shift of employees, divided into crews, each having a designated foreman. The coal was hauled out of the mine by the day shift, which quit

work at six o'clock in the evening, and the night shift went to work at this time. This night shift did not haul any coal out of the mines, or empties in, their duties being to take in timbers to be used by the miners the next day at various working places, clean up slate, make the entries safe, etc. For a distance of about 400 feet from the drift-mouth, the main entry of the mine was used in common by the crews of Mine No. 1 and Mine No. 2. One Andrew Brock was the night foreman in Mine No. 1, and A. B. Davis the night foreman in Mine No. 2. About two months before Williams (the plaintiff) was injured, he had been employed by Davis to work on his slate force, Davis having authority to employ the men who worked under him; and three or four days before the accident to Williams, Davis' regular motorman had quit, and he put Williams on as motorman. Davis admits that Williams did not ask him for this job, but that he simply put him on because he considered Williams was entitled to the job by reason of being the oldest member of his force, Davis making no inquiries of Williams as to his experience in running motors, nor had he or any one else for the company given Williams any instructions or called his attention to any rules with referenec to running motors.

On the evening that Williams was injured, which occured shortly before seven o'clock p. m., the two night crews were preparing to go into the mines—Brock into Mine No. 1, and Davis into Mine No. 2. Williams reported for duty about 6:30 o'clock and had been around on the premises near the drift-mouth for about fifteen minutes, a part of which time was spent by him at and around the motor house, when Davis, his foreman, ordered him to take his motor (which was standing on the "cut-around" track near the sand house) into the entry beyond the timber track switch (which, as before stated, was situated right at the mouth of the entry) so that motors "D" and "E"

could be shifted from the timber track on to the "cut-around" track.  But a few minutes before this (certainly not over twenty minutes) Brock had hauled with a big motor a car of brattice lumber into the entry, on the "cut-around" track, to a distance of from 25 to 35 feet from the drift-mouth, where he left it standing.  This brattice lumber, for use in the mines, was of irregular lengths, and extended out over the bumpers of the car towards the drift-mouth a distance of about four feet.  There was no light placed on this car, nor any signal of any kind to give warning of its presence, nor did the company have any rules with reference to lights or other signals in such cases.  There were two small motors standing near the sand house on the "cut-around" track, upon one of which Williams was to go into Mine No. 2 with Davis, his foreman; and Brock, the night foreman in Mine No. 1, was to go in with his crew on the other small motor.  The car loaded with brattice lumber had been pulled up the timber track by the big motor, and the big motor was standing on the timber track near the drift-mouth.  It was necessary to switch the motors so that the big motor could get out of the way of the little motors and one of them could back up to and couple with the car of brattice lumber.  In order to do this directions were given by Brock to Davis, according to what Brock states; or, according to Davis, he and Brock agreed that Brock should take the big motor and this car of brattice lumber from the timber track into the drift-mouth far enough to let the little motors run past the point of the switch and back on the timber track, it being the intention of Brock and Davis, after this was done, to run the big motor, with the car of brattice lumber, back towards the tipple on the "cut-around" track, when the big motor would cut loose from the car, run back into the mine past the point of the switch at the drift-mouth, and the little motors would then pull up past the point of

the switch, back back on the "cut-around" track, and then the big motor was to back into the timber track, whereby the way would be clear for one of the small motors to run ahead into the mine about its business, and clear for the other little motor to couple to the brattice car and take it in the mine.

Brock, in accordance with the directions of Davis, or in accordance with the understanding between them, ran the big motor into the mine, so that, as before stated, the end of the car-load of lumber was from 25 to 35 feet from the drift-mouth, or the point of the switch, the point of the switch being at the drift mouth. Brock then set the brake on the big motor and walked back on the "cut-around" track to near the sand house where Williams was with his motor, and Williams was then directed by Davis to pull his motor up past the point of the switch into the drift-mouth, and back it back on the timber track. Williams, without knowledge, as he states, that the car of lumber was standing within the entry, proceeded with his motor into the entry, with the view, and in accordance with what he had been told to do, of taking it to a distance beyond the point of the switch, and there stop and wait until some switching was done and his mine foreman, Davis, joined him. Davis was standing at the mouth of the entry when he ordered Williams to take his motor in, and knew that the car of lumber was standing in the entry and that it was unguarded and with no light or signal on it, but failed to notify Williams of the fact, his only excuse for not doing so being that he thought Williams had seen the car taken in. Williams claims to have looked ahead before going into the entry, but could see nothing. When the rear end of his motor had gotten about four feet into the entry, Henry Cotton, a laborer in the mines, who was either on the rear end of Williams' motor, or standing near the drift-mouth, noticed the car of lumber standing

on the track ahead and endeavored to warn Williams by halooing to him, but did not succeed in attracting Williams' attention until he was within two or three feet of the car of lumber. Williams then shut off his controller and endeavored to avoid the collision, both by reversing the current of his motor and by endeavoring to apply the brake, but was too close to avoid a collision with the car of lumber. He was "sorter setting down" when he first saw the car, and "sorter jumped up" then, to prevent the lumber catching him in the body. His right leg was caught between his own motor and the end of the brattice lumber and was broken just below the knee and otherwise crushed and injured.

The plaintiff, Williams, bases the liability of the defendant company to him for his injuries upon the grounds: First, because the place in which he was ordered to work was in an unsafe and dangerous condition, by reason of the car of brattice lumber being left unguarded within the entry to the mines, of which danger he was ignorant, and which he could not have discovered in the exercise of ordinary care; and the defendant company's foreman, Davis, who was the highest official of the company present at the time, had knowledge of this danger, and the duty of giving the plaintiff, Williams, warning devolved upon Davis, as vice-principal of the company; and that Davis' negligence in failing to give warning of the danger was the negligence of the company, rendering it liable for the injury resulting to the plaintiff therefrom; Second, that the defendant company was guilty of negligence in failing to adopt and promulgate proper and reasonable rules for the conduct of its business.

On the other hand, the defendant company contends that the real cause of the accident to the plaintiff was because he did not have the brake on his motor wound up as he should have had it, and that if he had had it in working

order the accident would not have happened.   Stress is also laid upon the fact that there was evidence to show that the plaintiff upon entering the drift-mouth was engaged in holding the pole to keep it in contact with the trolley wire and that this prevented him from looking ahead and prevented him from seeing the car of lumber as he might have done if he had been looking ahead.

With reference to this last contention of the defendant company, it is conceded that because of the conditions existing at the entry of the mines it was necessary that the trolley wire be made higher at this point, and that such condition of the wire made it necessary to hold the trolley pole against it.   While allowing this condition to exist may not have been negligence on the part of the defendant company, in view of the fact that the uncontradicted statement of the plaintiff that, in addition to the ordinary conditions then existing, a kink in the trolley wire made it necessary for him to give attention to keeping the trolley pole in contact with the trolley wire instead of looking ahead, the jury would, upon all the evidence in the case, have been warranted in finding that he was not negligent in giving attention at the moment to keeping his pole in contact with the trolley wire instead of looking ahead of his motor, especially in view of the fact that he had a right to rely upon the premises being kept reasonably safe for him to do the work that his foreman had directed him to do.

The case, as we view it upon the facts stated, falls directly within the rule enunciated in the cases of *Lane Bros.* v. *Bauscrman,* 103 Va. 146, 48 S. E. 857, 106 Am. St. Rep. 872, and *Low Moor Iron Co.* v. *La Bianca,* 106 Va. 83, 55 S. E. 532.   The proposition of law stated in the first-named of these cases was approved and followed in the last-named, wherein it is said: "Ordinarily the foreman or boss of a gang of hands employed in executing the master's orders is a mere fellow-servant with the other members of the

gang, but if he is discharging a non-assignable duty of the master he is to that extent a vice-principal.   One of these non-assignable duties is to exercise ordinary care to provide a reasonably safe place in which the servant is to work.   If the place was originally safe, but has become unsafe during the absence of the servant and he is ignorant of this fact, and cannot discover it by the exercise of ordinary care, it is the duty of the master to inform him of it, and in his absence this duty devolves upon the foreman of the gang, as vice-principal."

In this case, while Brock, as a witness for the plaintiff, and Davis, a witness for the defendant company, both state that the plaintiff, Williams, was standing near when the order was given by Davis to carry the car of brattice into the entry, and that Williams could have heard these directions and could have seen the car-load of brattice carried in, Williams testified that he neither heard the directions given by Davis with respect to the car being carried into the entry, nor saw it when carried in by Brock. As we have seen, neither Brock nor Davis state that Williams heard these directions given by Davis or saw the car carried into the entry, but only that they thought or were under the impression, that he heard the directions and saw the car carried in, so that the jury might have found the fact to be as positively stated by Williams, rather than have concluded from the impressions testified to by Brock and Davis that he did know that the car had been carried into the entry and left there.   The testimony for the defendant company given by Owens, its superintendent at these mines, as well as by Brock and Davis, recognizes the fact that Williams should have been warned of the presence of the car of brattice lumber standing in the entry, if he did not know it to be there; the last two named saying that they would have warned him if they had not thought he had seen the car taken in.

Since the jury might well have found upon the evidence that Davis, who was the highest official of the defendant company present on the grounds, had knowledge of this danger, and that the duty of warning Williams devolved upon him as vice-principal of the company, and that his negligent failure to give Williams warning of the danger was the proximate cause of the injury to him, this court must so find. *Low Moor Iron Co.* v. *La Bianca, supra,* and authorities cited.

The further contention of the defendant company, that Williams was guilty of contributory negligence in not having the brake on his motor properly wound up, is without merit. The evidence as to how quickly a motor running under control could be stopped with the brake in proper shape not only shows that the motor could be stopped a great deal quicker by reversing the current than by the use of the brake, but further shows the fact that Williams was within two or three feet of the car of lumber when he first saw it, and it was then too late to avoid the collision, even by reversing the current; therefore, the result would have been the same, whatever might have been the condition of the brake. Upon the evidence the jury would have been justified in finding that the condition in which Williams had his brake was not even a contributing cause of his injury.

With respect to the further contention, that Williams was guilty of contributory negligence in running his motor into the mine at excessive speed, and in running his motor further beyond the switch than was necessary, we deem it only necessary to refer briefly to the evidence. As to the speed of the motor, Davis, the foreman, testifying for the defendant company, stated that Williams should have had his controller on the second point. Not only did Williams say, when testifying for himself, that he had his controller on the first or second point, but Calton, testifying for the

defendant company, stated that he had it on the second point where Davis said it should have been. The evidence placed the car of lumber in the entry at a point from 25 to 35 feet from the drift-mouth, and admitting that the two motors on the timber track were small motors, each only 12 feet long, still the three motors, including Williams,' would have reached 36 feet beyond the point of the switch, without allowing any margin at all between, or any space for clearance.

The remaining ground of demurrer to the evidence, assigned by the defendant company, is also without merit, viz., that "Williams assumed the risk of the danger which caused his injury."

Williams testified that he had never known a car of brattice lumber to be left within the entry, and that it was the custom to leave such cars outside the entry, on the timber track, while the shifting was being done; and practically all the other witnesses testify that although the day shift frequently left motors standing within the entry, it was not customary to leave cars standing therein. It further appears from the evidence that there would be but slight danger of a collision with another motor, or an ordinary car, standing in the entry, on account of the protection afforded by the bumpers. In this instance a car-load of brattice lumber was left standing unprotected within the unlighted entry, with the irregular ends of the lumber extending four feet beyond the bumpers of the car, constituting an unusual danger.

An employee only assumes the risks ordinarily incident to the service, and those known to him or so obvious as to be readily observed by one of his age, experience and mental capacity, in the exercise of ordinary care. *Southern Ry. Co.* v. *Newton,* 108 Va. 114, 60 S. E. 625; *U. S. Leather Co.* v. *Showalter,* 113 Va. 479, 74 S. E. 400.

Upon the whole case in judgment, we are of opinion that

if it had gone to the jury they might readily and reasonably have found that the plaintiff, Williams, sustained the injury of which he complains without fault on his part, and solely as a result of the negligence of the defendant company, and it is too well settled to need citation of authority that if the jury might have found the defendant company guilty of negligence and the plaintiff free from contributory negligence, the court must so find on a demurrer to the evidence.

The judgment of the circuit court is affirmed.

*Affirmed.*