# PRICKETT v. SULZBERGER & SONS CO.

No. 6087.   Opinion Filed March 28, 1916.

Rehearing Denied May 9, 1916.

(157 Pac. 356.)

1.   **EVIDENCE—Res Gestae—Statements.**   In an action for personal injuries, resulting in the death of a servant, from falling down an elevator shaft of the master in the nighttime, testimony of eye witnesses to the accident that just as he was about to step off he stated to deceased, "Be sure it is there," and deceased replied, "Yes; it is here," is competent as a part of the **res gestae** indicating the impression on the mind of the deceased at the moment of stepping off that the elevator was there.

2.   **EVIDENCE—Opinion Evidence—Competency of Expert.**   The testimony of a skilled electrician as to the diffusion of light from lamps similar to those shown to have been used in lighting the vicinity of an elevator shaft where the servant fell and was killed, and as to the shadow or other effects produced thereby, due to the kind, condition, and location, is competent, on the question of proper or sufficient lighting of the place where the injury occurred.

3.   **MASTER AND SERVANT—Injuries to Servant—Fellow Servants —Concurring Negligence.**   The master is liable for injuries due to the concurring negligence of himself and a fellow servant in cases where the injury would probably not have occurred but for the negligence of the master.

4.   **NEGLIGENCE—"Proximate Cause."**   Strictly defined, an act is the proximate cause of an event when in the natural order of things, and under the particular circumstances surrounding it, such an act would naturally produce that event.

5.   **MASTER AND SERVANT—Injuries to Servant—Actions—Safe Place to Work—Question for Jury.**   Where there is an apparent choice of routes between two points, and no rule or recognition requiring the longer route to be used, instead of the shorter, which leads across an elevator, usually left at night at a point where it might be, and frequently is, used to cross an elevator shaft, as a means of access to a point where the servant has duties to perform, and where it appears that others use it similarly, and that it had been so used for several months, the question as to whether

notice of such use will be implied on the part of the master, and consent thereto likewise implied, is for the jury, even though it must follow that the master would owe the duty of making such passage and use reasonably safe by adequate lighting.

6. **SAME—Appliances and Place to Work—Duty of Master.** It is the undelegable duty of the master to exercise ordinary care to provide the servant a reasonably safe place to work, reasonably safe tools and materials with which to work, and reasonably safe and competent fellow servants with whom to work, and a failure in one or more of these duties will subject the master to liability for all damages proximately resulting therefrom, through injuries to the servant, even though the negligence of the fellow servant should contribute therewith to the injury, if the injury would probably not have occurred but for the negligence of the master in the performance of his duty.

7. **SAME—Place to Work—Lighting.** Where a servant is required to work at night in a place or required to pass in the nighttime from one point in the premises where employed to another, it is the duty of the master to sufficiently light the locality of his work and the course of his passage to enable him to discover and avoid danger due to conditions that may be variable at different times.

8. **NEGLIGENCE—Actions—Question of Law or Fact.** What is or what is not negligence is ordinarily a question for the jury, and not for the court. Where the standard of duty is not fixed, but variable, and shifts with the circumstances of the case, it is incapable of being determined as a matter of law, and, where there is sufficient evidence, it must be submitted to the jury to determine whether the duty of the master has been complied with. On the other hand, when the standard and measure of duty is defined by law, and is the same under all circumstances, its omission is negligence, and may be so declared by the court. It is only in cases where the facts are such that all reasonable men must draw the same conclusions that the question of negligence or the want of negligence becomes one of law for the court, and then only when no recovery can be had upon any view which can properly be taken of the facts which the evidence tends to establish.

9.- **SAME.** Negligence is so much a mixed question of law and fact —principally fact—that courts are seldom justified in saying that all reasonable men will agree with them on the question of whether a given state of facts constitutes the exercise of ordinary care.

(Syllabus by Robberts, C.)

*Error from District Court, Oklahoma County; .*
*Geo. W. Clark, Judge.*

Action by Ethel Prickett against the Sulzberger & Sons Company. Judgment for defendant, and plaintiff brings error. Reversed, and new trial ordered.

*F. L. Boynton* and *Nicholas & Lyle,* for plaintiff in error.

*Ames, Chambers, Lowe & Richardson* and *Bennett & Pope,* for defendant in error.

Opinion by ROBBERTS, C. This action was brought by Ethel Prickett against Sulzberger & Sons Company for damages alleged to have been sustained by reason of the death of her husband, Ray Prickett, because of the negligence of the defendant, by whom the deceased was employed at the time of his injuries.

The plaintiff alleges, in substance, that she was the wife of the deceased, who was in the employ of the defendant on or about September 25, 1912, when he sustained injuries by falling down an elevator shaft, from which injuries he died on or about October 4, 1912, leaving surviving him his widow and two children. She sets out in detail the facts alleged to give her a cause of action, and sets forth some 14 different acts or omissions of the defendant in connection with the service of the deceased, his surroundings, and fellow servants, which may be briefly condensed into an allegation that the defendant did not exercise ordinary care to furnish the deceased a reasonably safe place in which to work and reasonably safe fellow servants with whom to work, and to properly guard the deceased against accident by the promulgation of such rules as would have prevented the injury, which is alleged to have proximately resulted from these several causes.

Trial was had to a jury, and at the conclusion of the plaintiff's evidence a demurrer thereto was sustained by the court, and judgment rendered dismissing the action. Motion for a new trial was overruled, exceptions saved, and plaintiff appealed.

The ground on which the demurrer to the evidence was sustained was that the evidence was not sufficient to entitle the plaintiff to recover. The plaintiff urges that the court erred in this regard, and that it erred also in refusing to admit certain material testimony offered by her. It is practically conceded that the evidence admitted supported the allegations of the petition as to the employment of the deceased by the defendant, as to his sustaining fatal injuries at the time claimed, as to his earning capacity, as to the respective ages of the deceased and of the widow and children, the expectancy of life of the deceased and his wife, and their joint and average expectancies, and that no administration had issued on his estate. The remaining questions relate to whether there was any evidence admitted reasonably tending to show negligence on the part of the defendant, and whether reversible error resulted from excluding the offered evidence.

It appears from the record that the defendant maintained its business in two principal buildings, standing close together, connected at only one point above the ground; the connection consisting of a bridge running from the fifth floor of one building across the intervening alley into the other building at a point not corresponding with any floor of the latter building, but continuing on into and through a vestibule about 12 or 15 feet to an elevator shaft. This vestibule was inclosed in brick, and ran from the ground to the top of the building, and be-

sides the elevator shaft iron stairways ran up from story to story. The shaft and elevator were principally used for transferring packinghouse products from floor to floor, in the buildings where located, and transferring by means of the bridge connecting the elevator shaft with the floor of the building across the alley or open space to the other building.

The elevator was operated by an electric motor, not in the building in which the elevator itself was located, but in the building across the alleyway, and on the floor above that from which the bridge extended into the other building. It was one of the duties of the elevator boy, when leaving the elevator at night, to cross the bridge to the opposite building, ascend the intervening flight of stairs, and switch off the motor before going home, as the elevator was not operated at night. There was some evidence tending to show that the elevator boy most frequently left the elevator standing at the bridge when leaving it at his quitting time in the evening. There was at least some evidence from which a jury might reasonably have found that he did so. There was an iron bar by which the elevator doors were fastened shut from the shaft side and a sign on the doors "Keep Shut"; also a small hand hole through the wire netting in the elevator door at the bridge, but none at any other elevator landing. This hole was for the purpose of introducing the fingers, raising the bar, and thus enabling one to open the doors at the bridge.

On the matter of the use of the elevator the witness Johnson testified:

"I have seen the deceased cross the elevator between the bridge and the opposite deck four or five times."

Greer testified:

"I have seen the elevator at the bridge when the elevator boy left it there three or more times. He would leave it there and go across the bridge to shut off the motor that operates the elevator in the other building. The doors were closed."

Nichols, the elevator boy, said:

"I left the elevator mostly at the bridge floor, which is the fifth floor of the slaughterhouse, and between the fifth and fourth floors of the other building."

Patterson testified that he had seen the elevator at the bridge of nights. Lovett, the foreman, stated that:

"The elevator had been used for crossing the bridge between the buildings."

In answer to questions he said:

"Q. State where it was customary to leave the elevator at night. A. Well, I left that to the discretion of the elevator boy; it was usually left on the fifth floor. Q. On 5; you mean where the bridge is? A. Yes; most generally on one of those two points. It was seldom left below the bridge. There was no light in the shaft beneath the elevator."

Otis Prickett, who was a brother of the deceased, testified:

" I have been present there nearly every night when the elevator boy quit his work. I know he usually left the elevator at the bridge, and then he would go across the bridge and up to shut off the motor. * * * I have seen the employees very frequently cross the elevator shaft by crossing the elevator. I have crossed myself and have seen the foreman, Lovett, do so. If he didn't cross the elevator he could only reach the decks from the bridge by going down the stairs to the fourth floor, through a door, then across a room, and go up two flights of steps to the

upper deck. These latter steps were narrow wooden steps, with a rail on only one side to keep from falling. ·Q. Do you know of any rule being given, or put to the employees, or posted, or otherwise brought to their attention forbidding the use of the elevator? A. I do not."

He further said:

"The bridge, with the exception of one time, is about the only place I ever saw the elevator left during the months I worked there. The vestibule at the bridge was so dark that you could not well tell whether the elevator was there after dark from the lights. I have seen it there before dark, at night after the elevator boy left, and again before he came in the morning."

From these facts the jury might infer that there was a custom grown into a rule to leave the elevator at the bridge. There was no rule forbidding the use of the elevator by employees for the purpose of crossing. There was evidence tending to show that it had been so used by the deceased, and by others. Nearly all the witnesses testifying as to the use of the elevator were at the time of the trial employees of the defendant. The weight of their testimony, and the inferences drawn from it, and their manner of testifying, taken in connection with the testimony above mentioned, was a matter for the consideration of a jury, and they might from the manner of the witnesses infer that their testimony could have been more favorable to the plaintiff than it was but for the fact that they were employees of the defendant.

The evidence disclosed that in a room back of the elevator shaft, in the same building, and separated from the shaft only by a brick wall, were two decks containing considerable paraphernalia of the defendant used in mak-

ing oleo, from which it would be transferred across the elevator and bridge to the other building, and that a doorway through the wall of the elevator shaft a few inches below the level of the bridge permitted of this transfer. That the duties of the deceased required him to clean up these rooms and decks and the machinery used during the night, which was his workshift. That he also had the additional duty of crossing the bridge to the other building where vats containing oleo had to be stirred every hour while cooling. That in passing from these cooling vats in the one building to the decks in the room back of the elevator shaft he could choose two routes, if the elevator was at the bridge level. That the shortest and most direct route was to cross the elevator platform and step through the door immediately on to the decks where his night work mainly lay. That the other was to leave the bridge about four or five feet before reaching the elevator door, by turning to the right along a branch which led to a stairway, descending to the floor beneath, passing thence through a doorway into the room, and then ascending two short flights of steps to these decks.

The evidence shows that on the night of the injury, about 2:30 a. m., the deceased and a night watchman were at a point where the branch of the bridge met the stairway running from the floor below to the floor above the bridge. That the deceased told the watchman he would cross the bridge to get his coat, and stepped to the elevator door, reached his fingers through the opening in the netting, opened the door, stepped off its threshold, and fell down the open elevator shaft, some 4½ stories, to the bottom of the shaft, sustaining fatal injuries. The watchman was the only witness to this occurrence. The witness was asked:

"What did he say just—what, if anything, did he say about the elevator just before he stepped? What, if anything, was said by you and by him in reference to the elevator just as he was stepping off the bridge?"

An objection to each of these questions was sustained, and exceptions saved, and the plaintiff offered in the record to prove that, if permitted to answer the questions, the witness would have testified that just as the elevator door was opened, and just before he took the fatal step, witness said to him, "Be sure the elevator is there," and the deceased relied, "Yes; it is here." Complaint is made of this as prejudicial error, which will hereafter be considered.

The evidence shows that this vestibule in which the stairways ascend and the elevator shaft is placed is about 16 by 30 feet in size, and the bridge is about 14 feet above the fourth and seven feet below the fifth floor. That there were no lights in the vestibule, except 16 candle power incandescent lamps intended for lighting the space below the bridge, and these were placed about on a leved of the bridge. The testimony varies as to whether they were four inches higher, even with, or lower than the bridge. There was no light over the bridge, or so placed as to shine into the elevator shaft when the doors were open. These lamps had been lighted day and night continuously since the packing house began operation, two years before, without renewal.

The plaintiff in error called as a witness an expert electrician. He testified that this long use of the lights materially weakened the illumination. He testified to having been at the bridge, and that to properly light it so as to have the light to shine into the elevator shaft

the lights should have been overhead, above the bridge, as diffusion of light is sideways and downward, rather than upward. When asked whether the lights as placed on a level with the bridge would cast light into the elevator shaft so as to show the presence or absence of the elevator, an objection was sustained by the court, who held that the jury understood electric lights, and would not be aided by such testimony, and therefore excluded it, of which complaint is made by plaintiff in error, who excepted thereto. Other witnesses testified that the interior shaft and vestibule was very gloomy.

The evidence showed that the deceased was in good health, earning a fair wage, and that his home life was happy.

We gather from the record that it is the theory of the plaintiff in error that the practice of leaving the elevator at the bridge and using it for crossing purposes had continued so long as to give notice to the defendant thereof, or that with ordinary diligence it should have known of the custom, which would tend to establish acquiescence therein, and make it the duty of the defendant to maintain it there, under safe and proper regulation, and to sufficiently and properly light the space so as to have enabled the deceased to notice the absence of the elevator, and thus to have avoided the accident, and that the lights were so placed as to shadow the shaft and create the impression that the elevator was actually there, when it was not. It is also complained that the defendant failed in its duty to employ a reasonably competent, skilled, and careful elevator boy, but employed one of careless practices, without suitable inquiry, and continued his employment sufficiently long to have been presumed to know his

incompetency, conduct, and habits in that particular, and to have negligently disregarded them. There seems to be no contention that the elevator boy was other than a fellow servant of the deceased, with exemption from liability if his negligence was the sole and proximate cause of the injury. It is contended by plaintiff, however, that the negligence charged to the master in failing to sufficiently and properly light the situs of the injury and in failing to provide reasonably safe fellow servants, and to prescribe reasonably precautionary rules to guard deceased against injury, combined with the feature of the added negligence of the coemployee in not leaving the elevator at the bridge on the night in question, or sufficient light to enable the deceased to protect himself from the dangerous situation.

Counsel for plaintiff in error first contend that the court erred in refusing to admit the testimony of the witness that at the moment the deceased was stepping off the bridge into the elevator shaft he, speaking of the elevator, said, "Be sure it's there," and the reply of the deceased, "Yes; it is here," on the theory that the statement was a part of the *res gestae*. In our opinion, this was prejudicial error, for the reason that the reply carried an indication that the elevator appeared to be present. It is claimed by the plaintiff that the inadequate and improperly placed lights gave the delusion of the presence of the elevator, instead of showing its absence. That would go to the present, existing condition of the plaintiff's mind at the time of the accident, and not a narrative of a past occurrence or condition. *Res gestae* consists in a spontaneous statement of a present condition or fact accompanying the act. *Smith v. C., R. I. & P. Ry. Co.*, 42

Okla. 577, 142 Pac. 398; *City of Wynnewood v. Cox*, 31 Okla. 563, 122 Pac. 528, Ann. Cas. 1913E, 349.

The following able discussion of this subject is found in McKelvey on Evidence, sec. 198a:

"The subject of *res gestae*, as it is often called, is one of considerable complexity as exhibited by the cases. In theory it is simple. Every act which is done, every event which happens, is set in a frame of surrounding circumstances which make it stand out and appear strong and clear. These circumstances may consist of declarations made at the time by participants in the act of other acts done, of the position, condition, and appearance of inanimate objects, and of other elements which serve to illustrate the main act or event. It is when they comprise statements, exclamations, and answers to questions, and other verbal utterances by the participants in the act or event, that they occupy the attention of the courts. If it had been possible to plead verbal utterances made under such conditions purely as acts, and not in any sense as evidence of the things stated, the subject of *res gestae* would not have belonged under the head of exceptions to the hearsay rule. But declarations of this sort were urged upon the court most strongly when they were wanted and needed as evidence of the facts to which they referred, and and the courts received them as such evidence, and thus created another exception to the rule against hearsay. The ground of reliability upon which such unknown declarations are received is as spontaneity. They are the *ex tempore* utterances of the mind under circumstances and at times when there has been no sufficient opportunity to plan false or misleading statements; they exhibit the mind's impression of immediate events, and are not narrative of past happenings; they are uttered while the mind is under the influence of the activity of the surroundings. The conflict in the decisions arises mainly in regard to the extent of time which the *res gestae* is held to cover; and, when it is considered that each case where

a declaration of this sort is offered is an independent case, to be treated upon its own facts, always, however, with the general principle of admissibility in mind, it will be seen that a harmonious classification of the cases is impossible."

The author cites as a leading case *Travelers' Ins. Co. v. Mosley,* 8 Wall. 397, 19 L. Ed. 437, which supports the text and constrains us to hold the rejected evidence within the rule. In that case Mr. Justice Swayne, speaking for the court, says:

"To bring such declarations within this principle generally they must be contemporaneous with the main fact to which they relate. * * * Here the principal fact is a bodily injury. The *res gestae* are the statements of the cause made by the assured almost contemporaneously with its occurrence, and those relating to the consequences made while the latter subsisted and were in progress. * * * The tendency of recent adjudication is to extend, rather than to narrow, the scope of the doctrine. Rightly guarded in its practical application, there is no principle of law of evidence more safe in its results."

Many illustrative cases are found in the books which support this contention, and the weight of authority seems to be in harmony therewith. *Atlanta O. S. Ry. Co. v. Bagwell,* 107 Ga. 157, 33 S. E. 191; *Stebbins v. Township of Keene,* 55 Mich. 552, 22 N. W. 37; *Chat. R. C. Co. v. Clowdis,* 90 Ga. 258, 17 S. E. 88; *Parker v. Boston & H. S. Co.,* 109 Mass. 449; *Hallahan v. N. Y., L. E. & W. R. Co.,* 102 N. Y. 194, 6 N. E. 287; *Mo. P. R. Co. v. Collier,* 62 Tex. 318; *Miller v. Eversole,* 184 Ill. App. 362; Whart. Cr. Ev. sec. 262.

As we understand it, the test as to whether statements are admissible in evidence as a part of the *res gestae* is: Did the declaration accompany the act to such

an extent as to actually become a part of the transaction itself? If so, it is admissible; otherwise not. The rule laid down in *People v. Davis,* 56 N. Y. 95, is:

"Did the proposed declaration accompany the act, or was it so connected therewith as to become a part thereof? If so, it is a part of the *res gestae,* and competent; otherwise it is not."

The same principle was expressed in *Tilson v. Terwilliger,* 56 N. Y. 273, wherein it is said:

"To be a part of the *res gestae* they must be made at the time of the act done which they are supposed to characterize; they must be calculated to unfold the nature and quality of the act which they are intended to explain; they must so harmonize with those facts as to form one transaction. There must be a transaction of which they are considered a part; they must be concomitant with the principal act, and so connected with it as to be regarded as the result and consequence of coexisting motives."

This rule has been approved and adopted by many courts, and it is not a mere matter of discretion on the part of the trial judge or court to determine whether the proposed evidence is admissible. The question of the admissibility of the evidence is determinable by well-settled principles of law, which must be applied to each case as the facts appear; the only restriction being that the declaration must be contemporaneous with and a part of the principal transaction, and derive some degree of credit from it.

"The cries or exclamations of bystanders upon seeing an accident about to occur may be proved to explain the state of mind and conduct of a person hearing them, and who was injured in the accident." (107 Ga. 157, 33 S. E. 191.)

"Remarks of a fellow passenger to the witness, as to the speed of a train, made while it is moving, are admissible when that fact is in issue."   (62 Tex. 318.)

In *Sessions v. Little,* 9 N. H. 271-276, it is said:

"Where evidence of an act done by a party is admissible, his declarations, made at the time, having a tendency to elucidate or give a character to the act, and which may derive a degree of credit from the act itself, are also admissible as a part of the *res gestae.*"

The same court, in *Wiggin v. Plumer,* 31 N. H. 251-267, says:

"When a fact is offered in evidence, the whole transaction, if it consists of many particulars, may and ought to be proved.   Every additional circumstance proved may vary the effect of the evidence, may neutralize it, or give it point.   What is then said by the parties, and what is said by others to them, relative to the subject of the transaction, is a part of the transaction itself.   It is admissible on the same principle that every other part of it is, that the whole matter may be seen by the jury."

In *Murray v. Railroad,* 72 N. H. 34, 54 Atl. 289, 61 L. R. A. 495, 101 Am. St. Rep. 660, the court uses the following language:

"The verbal statement of a person made under some circumstances may be a part of the actual occurrence, and be entitled to as much weight as evidence as any other part of the transaction.   This is the principle, it is believed, that is involved in the somewhat obscure doctrine of *res gestae,* which is often resorted to, apparently more on account of its convenient indefiniteness than for its scientific precision.   But the principle, whether expressed in an abbreviated Latin phrase or otherwise, is an important one in any system of evidence whose object is the ascertainment of facts.   Its development has been promoted in modern times by an effort to afford the triers of fact

all reasonable means of ascertaining the truth, instead of withholding from them all information possible by the rigid application of certain rules of exclusion. The question is not now how little, but how much, logically competent proof is admissible."

To our mind this evidence was clearly competent for the purpose of showing that the shaft or supposed elevator was poorly lighted, and we cannot say that the jury would not have been justified in inferring that it was so customary to use the elevator as a part of the bridge that the deceased had reason to believe it was there and in the dimness of the light acted upon that supposition, and stepped to his death. At least these statements, with all the other facts, were proper for the consideration of the jury.

The contention that the court erred in refusing to permit an expert electrician to testify concerning the proper manner of lighting the vestibule, so that the deceased would have been able to see that the elevator was not at the bridge, and as to the diffusion of light from incandescent light bulbs suspended by a cord at about the level of the bridge, it seems to us, is well founded. It is true that witnesses testified to the gloominess of the vestibule, but we cannot say that the learned judge was right in holding that the subject of electric lighting is so generally understood that the testimony of an expert would not aid a jury in determining an issuable fact pleaded and sought to be established in part by such evidence. Such testimony could not have prejudiced those of the jury who might already be equally informed, and it might have been of assistance to those not so well posted.

"A witness' opinion is admissible as evidence, not only where scientific knowledge is required to compre-

hend the matter testified about, but also where experience and observation in the special calling of the witness give him knowledge of the subject in question beyond that of persons of common intelligence." (*Little Rock, etc., Ry. Co. v. Shoecraft*, 56 Ark. 465, 20 S. W. 272; 17 Cyc. 36, 37 *Do*. 42, 43; *Meily v. S. F. Ry. Co.*, 215 Mo. 567, 114 S. W. 1013; *C., R. I. & P. Ry. Co. v. Hale*, 176 Fed. 71, 99 C. C. A. 379; 17 Cyc. 64, 65; *Hintz v. Wagner*, 25 N. D. 110, 140 N. W. 729; *Koenig v. Union Depot Ry. Co.*, 173 Mo. 698, 73 S. W. 637.)

The rule laid down in Cyc. vol. 17, pp. 71, 72, seems to be that: Experience in any walk of life presumably not shared by the average jury may be the subject of such testimony. The range of this testimony is unlimited except in so far as controlled by the sound discretion of the court in insisting upon the requisite foundation and conditions. Electrical and mechanical engineers are competent to testify as experts as to imperfect hanging of lamps. *Excelsior Electric Co. v. Sweet*, 57 N. J. Law, 224, 30 Atl. 553.

On the question of the fellow servant this court has held that, if the master has failed in its duty to exercise ordinary care to furnish the employee a reasonably safe place to work, he is liable regardless of the standing or authority of the coemployee through whose negligence one is injured.

In *Ruemmeli Braun Co. v. Cahill*, 14 Okla. 422, 79 Pac. 260, this court says:

"It is the positive duty of the master to use reasonable care in providing safe tools, machinery, and appliances to work with, a safe place to work in, safe material to work on and safe fellow servants or coemployees, and, if the business is such as to require it, to provide safe and proper rules and regulations for the conducting of the

same. Negligence in the performance of any of these positive duties will render the master liable without regard to the standing or authority of the employee through whose fault the injury is occasioned."

There seems to be great uniformity in the authorities to the effect that a master negligent in not furnishing a reasonably safe place to work cannot escape liability because the negligent act of a fellow servant contributed to the injury. *C. J. Ry. Co. v. King*, 169 Fed. 372, 94 C. C. A. 652; *Kreigh v. Westinghouse, Church & Kerr*, 214 U. S. 249, 29 Sup. Ct. 619, 53 L. Ed. 984. If the injury is caused by the concurring negligence of a fellow servant and the master, and the injury would probably not have occurred but for the negligence of the latter, the master is liable. *Atoka C. M. Co. v. Miller*, 7 Ind. T. 104, 104 S. W. 555. However, the servant of the master to whom was delegated the duty of lighting this building and the place of accident would not be considered a fellow servant of the deceased in this particular duty, as the duty of properly lighting is not a delegable duty (*Neeley v. Southwestern C. S. Co.*, 13 Okla. 356, 75 Pac. 537, 64 L. R. A. 145), although the elevator boy probably would be a fellow servant. The master may have used reasonable diligence to provide reasonably safe fellow servants, and yet be liable for injuries caused by his otherwise concurring negligence.

In this case it is claimed both that the master was negligent in employing as elevator man an incompetent and careless boy, who negligently left the elevator at the wrong place, and that the master by reason of improper and insufficient lighting made it so that the negligent act of the negligent fellow servant was not capable of discovery, but, on the contrary, that the master, by failure

to properly light, made apparent a false condition of safety, whereby the deceased was fatally injured. If the evidence warranted either of such inferences, the case should have gone to the jury with suitable instructions. This court, in the first two headnotes in *Ardmore O. & M. Co. v. Robinson*, 29 Okla. 79, 116 Pac. 191, sustains this doctrine in the following language:

"Where the service in which the servant is to be employed is such as to endanger the lives and persons of co-employees, the master, before engaging such servant, is required to make reasonable investigation into his character, skill, and habits of life, and he is also bound to institute affirmative inquiries in order to ascertain the qualifications of a servant whom he transfers to a more responsible position for which special qualifications are necessary, unless the servant has given proof of his capacity in some similar position. Whether an employer has made reasonable investigation into the character, skill, and qualifications of a servant is a question of fact for the jury."

See, also, *Van Winkle Gin & Machine Co. v. Brooks*, 29 Okla. 351, 116 Pac. 908.

Nor is it indispensable that the master shall have actual knowledge of a servant's incompetency, if by the use of reasonable diligence he might have known it. 26 Cyc. 1298, 1299.

This rule applies also where the negligence of the master consists in failure to give and prescribe proper rules of safety for the guidance of employees, and concurs with that of a fellow servant, which latter was the direct supervening cause of the injury. *G., C. & S. F. Ry. Co. v. Hays*, 40 Tex. Civ. App. 162, 89 S. W. 29; *Archer Foster Const. Co. v. Vaughn*, 79 Ark. 20, 94 S. W. 717.

When neither of the concurring acts of negligence is alone an efficient cause, but, combined, both are efficient

causes, the master is liable. *I. C. R. Co. v. Johnson*, 95 Ill. App. 54; *Id.*, 191 Ill. 594, 61 N. E. 334. If the acts of the servant would not have resulted in the injury but for the negligence of the master, the master is liable, but, if the injury would have occurred because of the act of the servant, though the master had been free from negligence, then the master would not be liable. *Gila Valley G. & N. Ry. Co. v. Lyon*, 9 Ariz. 218, 80 Pac. 337, affirmed in 203 U. S. 465, 27 Sup. Ct. 115, 51 L. Ed. 276.

Such being the law, it is an important question in this case to determine from the evidence what was likely to have been the proximate cause of this injury.

In the late case of *M., O. & G. Ry. Co. v. Miller*, 45 Okla. 173, 145 Pac. 367, the court, speaking on this subject, says:

"Strictly defined, an act is the 'proximate' cause of an event when in the natural order of things and under the particular circumstances surrounding it such an act would necessarily produce that event; but the practical construction of 'proximate cause' by the court is a cause from which a man of ordinary experience and sagacity could foresee that the results might probably ensue. *Enochs v. Pittsburgh, C., C. & St. L. Ry. Co.*, 145 Ind. 635, 41 N. E. 658. Or, as stated by some of the courts, where the question is whether * * * it was such that a person of ordinary intelligence and prudence should have foreseen that the accident was liable to be produced by that cause. *Wilber v. Follansbee*, 97 Wis. 577, 72 N. W. 741, 73 N. W. 559; *Block v. Milwaukee St. Ry. Co.*, 89 Wis. 371, 61 N. W. 1101, 27 L. R. A. 365, 46 Am. St. Rep. 849; *Davis v. C., M. & St. P. Ry. Co.*, 93 Wis. 470, 67 N. W. 16, 1132, 33 L. R. A. 654, 57 Am. St. Rep. 935. Where different forces and conditions occur in producing a result, it is often difficult to determine which is properly to be considered the cause. The law will not go further

back than to find the active, efficient, and procuring cause, of which the event under consideration is a natural consequence."

Counsel for defendant rest their case upon two propositions: (1) The elevator was not a proper means of passage from one building to the other; and (2) it had not been used for that purpose with knowledge and consent of the defendant, so as to establish a custom, nor had it been used for that purpose for a sufficient length of time and under such conditions that the defendant with ordinary diligence should have known of the custom.

In support of these contentions counsel cite and quote a considerable amount of testimony bearing upon that subject, which to their minds, and possibly to the court's mind, was entirely sufficient to establish these facts, but that is not the question presented here. The question to be determined here is: Was there any evidence reasonably tending to establish the proposition submitted by defendant? We think there was. It is not a question of the weight or sufficiency of the evidence; that must be left to the jury. It is left to them to say from all the evidence introduced and the facts and circumstances of the case whether the elevator was a means of passage, and whether or not it had been used for that purpose with knowledge and consent of the defendant, so as' to establish a custom, or for a sufficient length of time and under such circumstances that the defendant, with ordinary care, should have known of the custom. It is a well-known fact that our courts are exceedingly zealous in their determination to prevent encroachments upon the province of the jury in relation to their right and duty to pass upon the facts of the case, so much so that it was

made one of the fundamental protective policies of our people, and has become one of the well-known bulwarks of our civil procedure.

We have no sympathy with and cannot approve the theory of counsel for defendant in error that, if plaintiff was not an habitual user of the elevator as a part of the passageway, the defendant owed him no duty and was under no obligation to him, as an employee, to furnish necessary lights, for the safe and proper use of the elevator in that way. There is some evidence that it was often used as such, and had been for months prior to the accident. This fact was not only known to the foreman, but he himself so used it, and no objection was ever made to such use of it. It might not require a great stretch of imagination to say that there was some evidence tending to show that it was left at the bridge for the express purpose of being used as a part of the passageway. At least we feel well assured of the fact that there was sufficient evidence to not only justify, but require, the submission by the trial court of the question to the jury.

We do not overlook the doctrine as stated in section 3907, vol. 4, of Thompson on Negligence, that:

"The master is not liable to his servant for an injury received from an elevator in the master's building with respect to which the servant has stepped outside the line of his duty and assumed the position of bare licensee."

But we must not forget that further rule laid down in the same section that:

"Where an employer allows his employees to use an elevator as a means of transportation, then they do not stand toward him in the relation of trespassers or intermeddlers, but the law requires him to exercise reasonable

care and caution in their behalf both in the construction and in the operation of the machine."

If, then, the jury should find that the deceased had the right to use the elevator as a means of crossing to the decks instead of taking the distant, circuitous, and, as some witnesses put it, hazardous route by the stairway, it may be assumed that it is a pertinent inquiry whether the master did not owe the duty to the employee to sufficiently light the vestibule over the elevator doors to enable the deceased to discover the absence of the elevator, and whether the failure of the master to light the passage was not negligence. There was no rule or regulation forbidding the use of the elevator in crossing. There is evidence that the deceased used it continually when there, and that it was generally there. There is evidence that the foreman so used it, with this difference, that he left the elevator down the difference in the levels between the bridge and the upper deck before stepping to the deck, whereas the deceased stepped off without lowering it. The jury might have inferred from this an even more extensive use, or a general use, and an implied consent to its use by the employees. It cannot be said as a matter of law that the master had no reason to suppose that an employee, in the absence of rules, would take the longer in preference to the shorter route to reach the decks over the bridge.

The question of contributory negligence and the question of assumption of risk need not occupy our attention in this case, because of the provisions of our Constitution withdrawing from the court the right to determine whether the evidence shows the person injured is brought within these doctrines, and leaving this for the sole de-

termination of the jury. Negligence is defined to be the want of ordinary care by one owing the duty of such care to another. As to what is, ordinary care is a question of variable answer in every succeeding decade of time, and changes with the conditions of the times, the introduction of new industries, and new mechanical devices. It even changes with evolutionary public sentiment in the use of ever-changing mechanical devices. What was tolerated by public sentiment a decade ago is no longer permissible in the public judgment of today. We have now attained a stage when "safety first" is a byword of daily use. The response of public bodies and departments of labor and commerce to the voice of human judgment is taking shape in investigations into the scope and statistics of "preventable accidents." Among these it is not out of place to say that our own state is prescribing means of prevention of accidents in flouring mills and factories, and directing the installation of shields and guards heretofore considered dispensable about the moving parts of machinery.

In the course of the investigations of a federal department of government it has been shown that under otherwise like conditions there are many more accidents at night than in the daytime, and in poorly lighted than in well lighted situations of possible danger. The tendency of these investigations and the results in the light of the cry of "safety first" is toward the demand of the public for the prevention of preventable accidents and the lighting of gloomy places of labor.

In the consideration of the subject of the proper lighting of manufactories and other places of employment we recall an article published in the January, 1916, number of that splendid and most useful publication, the Literary

Digest, under the head "Light as a Safety Device," and are tempted to quote it in part, as follows:

"A large proportion of industrial accidents are due to insufficient lighting; and yet in all the agitation for 'safety first' this fact has been practically ignored. We install guards around cogwheels or other moving parts, and then allow our workmen to break their legs by falling over boxes in an ill-lighted room. When we provide light enough, we often arrange it and regulate its intensity in such manner that it becomes an irritant instead of an aid. In an article contributed to the Illustrated World (Chicago, December), under the head 'Lighting to Save Lives,' John A. White tells us that the greatest number of accidents in industrial plants occur in December and January—the months of least daylight. This relation of illumination to accidents can be traced through every month. June boasts the longest day in the year and usually the fairest weather, and June also is the month that shows the fewest accidents. The writer goes on:

" 'As an additional proof that accidents increase in direct ratio to gloom and darkness, a United States Senate report on a large steel plant adds weight. During a period of five years in all the various departments, six in all, of the steel plant in question, the accidents at night outnumbered those of the day, in some cases by as much as 100 per cent. While probably other factors must here be taken into consideration, yet unquestionably this tremendous discrepancy between day and night accidents can be due in large measure only to the difference in degree of illumination. * * *

" 'It is rather odd that in all the agitation for safety devices around machinery the importance of lighting has not been sufficiently emphasized or insisted upon, or even where proper precautions have been taken to illuminate the machinery little heed has been given to lighting the floor space or the passages. A man cannot be expected to come from a glare of light and step into semigloom with-

out having his eyes so completely dazzled that for the moment he is blinded.   Employees temporarily blinded in this manner are frequently injured by stumbling over boxes or other obstacles that have perhaps been placed on the floor.   *   *   *

" 'Only a few years ago it was customary in many plants, large as well as small, to shorten the working day during the midwinter months because of lack of proper illumination.   But manufacturers are realizing that this is a shortsighted business policy.   Also they realize that it is a shortsighted policy to compel men to work under any but the best possible conditions that may be provided.

" 'They have begun to give careful thought to lighting problems, and, as a result, the modern factory plants going up in such cities as Detroit, New York, Pittsburg, Chicago, and elsewhere are almost as brilliant as the photographer's studio.   Brick or concrete walls seem hardly to exist.   The sides are a mass of glass.

" 'Four factors may be taken into consideration with regard to the proper illumination of industrial plants. The first is the question of how best to introduce daylight into a building; the second concerns the use of artificial illumination; the third, employment of methods for properly diffusing light; and, lastly, the question of selecting the right sort of artificial illuminant, and so protecting it as to avoid fires and explosions.'

"It is being discovered that large expenditure for more light actually pays in hard cash.   *   *   * "

We have no sympathy with and cannot approve the statement of counsel for defendant in error wherein he says that, if plaintiff was a trespasser, it was none of his business as to lights, etc.

As before said, the question of whether an act or omission is negligence depends upon the nature and extent

of the duty of the factory employer to the employee, and is a mixed question of law and fact. As to when it is one solely of law for the court and when it is one solely of fact for the jury, or so far mixed that the question of fact predominates to the extent that the jury must determine it, is more difficult, but that is the question which we are now called upon to determine.

It is the undelegable duty of the master to exercise reasonable care and diligence to provide the servant with a reasonably safe place to work, with reasonably safe tools and implements with which to work, in default of which the master is liable for all the consequences which a prudent and experienced party, fully acquainted with all the circumstances which in fact existed, whether they could have been reasonably ascertained by reasonable diligence or not, would have thought at the time of the negligence reasonably possible to follow if they had been suggested to his mind. *Midland Val. Railway Co. v. Williams*, 42 Okla. 444, 141 Pac. 1103; *C., R. I. & P. v. Townes*, 43 Okla. 568, 143 Pac. 680; *Choctaw C. O. Co. v. Pope*, 47 Okla. 383, 148 Pac. 170; *Sulzberger & Sons Co. v. Castleberry*, 40 Okla. 613, 139 Pac. 837. To this may be added that it is likewise undelegable duty to furnish "reasonably competent fellow servants to work with." *Choctaw Elec. Co. v. Clark*, 28 Okla. 399, 114 Pac. 730; *Ardmore O. & M. Co. v. Robinson, supra.*

Where the duties of the servant require him to work at night, the failure to furnish sufficient light to enable him to do so with reasonable safety is negligence on the part of the master, and renders him liable for injuries proximately resulting therefrom. *Railroad Co. v. Taylor*, 69 Ill. 461; *Rolling Stock Co. v. Wilder*, 116 Ill. 100, 5

N. E. 92; *Car Co. v. Laack,* 143 Ill. 242, 32 N. E. 285, 18 L. R. A. 215; *Nat. Syrup Co. v. Carlson,* 155 Ill. 210, 40 N. E. 492; *L. & N. R. Co. v. Andrews,* 171 Ala. 200, 54 South. 553.

"Plaintiff, an employee of a manufacturer, had occasion to go through a passageway between two machines, and struck his leg against an iron rod projecting from one of the machines. He had never used the passage before, but had seen it used by operatives and overseers. The light in the passageway was insufficient, and the similarity in color between the machines and the floor and rod tended to render the obstruction invisible. Plaintiff looked for obstructions, but saw none. Held, that it was proper to overrule a motion for nonsuit urged on the ground of plaintiff's assumption of risk." *(Edwards v. Tilton Mills,* 70 N. H. 574, 50 Atl. 102.)

"A servant injured when taking his motor into a mine by collision with projecting timbers on another motor standing unprotected in the unlighted entry did not assume the risk; he being ignorant of the presence of the car, and it not being customary to leave cars standing there." *(Stonega Coke & Coal Co. v. Williams,* 115 Va. 657, 80 S. E. 100.)

"The fact that an employee has worked for years under the same conditions does not necessarily preclude his recovering damages against his employer upon the ground of negligence in failing to provide sufficient light, apart from any consideration of complaint on his part or of any promise to repair the defect." *(Tecza v. Sulzberger & Sons,* 92 Kan. 97, 140 Pac. 105.)

When we stop to consider that a democratic form of government lodges in the people the power of government and the making of laws, and that the same people who make those laws are called into the jury box to determine the issues of negligence, it denies the rules of

consistency to assert that the carefully selected jurors are not fitted with the qualification of "reasonable men," so as to permit them to determine the questions of negligence in cases such as this. Some regarded it as a gentle rebuke to the courts when the framers of the Oklahoma Constitution provided that "contributory negligence" and "assumption of risk" should always be submitted to the jury. Negligence is negligence, whether on the part of the plaintiff or on the part of the defendant. It is the failure to exercise ordinary care. If a jury is qualified to determine negligence of one party, it is likewise qualified to determine that of the other. Nearly ten years of statehood under this clause of our Constitution has failed to negative the confidence of its framers in the intelligence and fairness of the average jury. It must be borne in mind also that by reason of their environment judges on the bench are one step further removed from contact with these questions than the jurors themselves. The latter come from every walk in life, and are qualified by experience to deal with the questions involved, and obtain first-hand impressions of the duties of master and servant, which only reach the judge on the bench through evidence, and become in a sense secondary, and not primary, evidence, and likewise secondary, and not primary, qualifications for determining many questions of fact. The jury is a composite body of men possessing the average of wide experience, and an average intelligence. The judge is dealing forever with the evidence of others, and his conclusions are based upon the history of events, and not the ability to sense the significance of evidence as a jury may and will. How rarely, then, can the trial court be as well qualified to determine the fact of negligence as the jury.

. Who, then, shall determine whether in this case the. defendant was negligent? The court refused to admit evidence which we think both competent and material. But equally important is the question as to whether the evidence which was admitted should have been submitted to the jury for its determination. The lower court determined as a matter of law that the defendant's negligence had not been shown.

"On a demurrer to evidence it must be taken that he who interposes it admits all the facts which the evidence in the slightest degree tends to prove, and all the inferences or conclusions which may be reasonably and logically drawn therefrom, and the court will not weigh conflicting evidence, but will treat as withdrawn all evidence which is most favorable to the party demurring." (*Annear v. Swartz*, 46 Okla. 98, 148 Pac. 706, L. R. A. 1915E, 267.)

When may the lower court say as a matter of law that there is no evidence of negligence on the part of the master? Perhaps the latest expression is to be found in *Interstate Compress Co. v. J. A. Arthur*, 53 Okla. 212, 155 Pac. 861, in which the syllabus lays down the following rule:

"What is or what is not negligence is ordinarily a question for the jury, and not for the court. Where the standard of duty is not fixed, but variable, and shifts with the circumstances of the case, it is incapable of being determined as a matter of law, and, where there is sufficient evidence, must be submitted to the jury to determine what it is and whether it has been complied with. On the other hand, when the standard is fixed and when the measure of duty is defined by law and is the same under all circumstances, its omission is negligence, and may be so declared by the court. It is only in cases where the facts are such that all reasonable men must draw the same conclu-

sions from them that the question of negligence becomes one of law for the court, and then only when no recovery can be had upon any view which can properly be taken of the facts which the evidence tends to establish."

To the same effect are the following: *Supreme Tribe Ben Hur v. Owens*, 50 Okla. 629, 151 Pac. 198, L. R. A. 1916A, 979; *Shields v. Smith*, 50 Okla. 548, 151 Pac. 207; *Continental Ins. Co. v. Chance*, 48 Okla. 324, 150 Pac. 114; *Frisco L. Co. v. Thomas*, 42 Okla. 670, 142 Pac. 310.

"It is always a question for the jury when there is a reasonable doubt as to the facts, or as to the inferences to be drawn from them; i. e., where reasonable men may differ as to the existence thereof." (*Rock Island Co. v. Davis*, 44 Okla. 412, 144 Pac. 600.)

Recurring to what we have already said about the variable standards of duty of employers toward employees in different periods of time, and the progress and elevation of labor, and the respect due to the laboring man and his occupation, as well as the desire to give due regard to his safety, and to extend the Golden Rule to the protective surroundings of his employment, we are impressed with the fact that few cases can be justifiably taken from the jury where the charge is neglect in the performance of some duty of safety owing the employee by his employer.

In the instant case the questions at issue were as to the fact of the exercise of ordinary care on the part of the defendant: (1) in reference to lighting; (2) reasonably safe and competent employees; (3) reasonably safe place to work; (4) promulgating rules of safety; and (5) the efficiency or proximation of the cause to the injury. The cases make no distinction between these classes of alleged negligence in determining whether they are for the consideration of court or jury. As to proximate cause the

sufficiency of the evidence to show the same is for the jury. *Coalgate Co. v. Hurst*, 25 Okla. 597, 107 Pac. 661; *C. R. I. & P. Ry. Co. v. Ashlock*, 36 Okla. 706, 129 Pac. 726.

"The proximate cause of an injury is ordinarily a question for the jury. It is not a question of science or of legal knowledge. It is to be determined as a question of fact, in view of the circumstances and facts attending it." *(St. Louis & S. F. R. Co. v. Davis*, 37 Okla. 340, 132 Pac. 337.)

Where there is any doubt as to which of several probable causes produced the injury, the cause of the injury is properly a question for the jury. *Petroleum Iron Co. v. Wantland*, 28 Okla. 481, 114 Pac. 717.

"And, if it be true * * * that this might have been a mere accident that might have occurred under any circumstances, then it was proper to submit the question to the jury under proper instructions, and let them determine from the evidence whether it was a mere accident, * * * or whether it was due to the negligence of the plaintiff in error." *(Sulzberger & Sons Co. v. Hoover*, 46 Okla. 792, 149 Pac. 887.)

Whether the master has made suitable inquiries into the qualifications of a fellow servant is for the jury. *Ardmore O. & M. Co. v. Robinson, supra; Sulzberger & Sons Co. v. Hoover, supra.* As to what constitutes a reasonably safe place to work is for the jury. *St. L. & S. F. R. Co. v. Hurley*, 30 Okla. 333, 120 Pac. 568.

As to the necessity, character, and amount of light which ought to be furnished it is invariably held to be a question for the jury to determine whether the defendant was negligent. The following are some of the illustrations of its application: Where a brakeman, not having been furnished with a lantern, fell through a hatchway of a refrigerator car, *T. & P. Ry. Co. v. Murphy*, 238 U.

S. 320, 35 Sup. Ct. 779, 59 L. Ed. 1329; the location of a skid and the necessity of any for artificial light were both questions for a jury, and whether the platform was so dark and the skid so placed as to constitute negligence were for the jury, *M., O. & G. Ry. Co. v. Flanagan,* 40 Okla. 502, 139 Pac. 696 (see *Clark v. St. L. & S. F. R. Co.,* 24 Okla. 764, 108 Pac. 361); also where a servant fell under a dimly lighted scaffold, *Dickson v. Geo. B. Swift Co.,* 238 Ill. 62, 87 N. E. 59; servant falling through opening in railway tunnel insufficiently lighted, *Copper River N. W. Ry. Co. v. Heney,* 211 Fed. 459, 128 C. C. A. 131; falling through a hay chute in master's barn, *Moellman v. Gieze Henselmeier Lumb. C.,* 134 Mo. App. 485, 114 S. W. 1023; stevedore falling into uncovered hole in unlighted deck, *Clinton v. Munson S. S. Line,* 132 App. Div. 59, 116 N. Y. Supp. 383; insufficiently lighted platform, *Burrows v. Likes,* 180 Mo. App. 447, 166 S. W. 643; as to whether want of light was proximate cause of injury, *Burns v. North Iowa Brick & Tile Co.,* 130 N. W. 1083; where one fell down an elevator shaft, due to the want of light making it apparent that the floor extended into it, *Swift & Co. v. Martine,* 53 Tex. Civ. App. 475, 117 S. W. 209; where a workman was injured in an elevator by a protruding girder not noticed for want of sufficient light, *Olson v. Hanford Prod. Co.,* 111 Iowa, 347, 82 N. W. 903; falling into elevator shaft in gloomy, insufficiently lighted room, *Wendler v. People's Housefitting Co.,* 165 Mo. 527, 65 S. W. 737.

In view of the great weight of authority supporting these contentions, we are forced to the conclusion that there was evidence reasonably tending to support the allegations of the plaintiff's petition, and that the trial

court erred in refusing to submit the case to the jury under proper instructions.

For the error of the court in sustaining the demurrer to the evidence, and in the rejection of testimony, the judgment should be reversed, and a new trial ordered.

By the Court: It is so ordered.